Bennett, Judge,
delivered the opinion of the court:
The plaintiff in this civil service pay case was, until January 27, 1976, Hyman L. Erdwein, a former GS-9 meat inspector in the Department of Agriculture whose suspension and dismissal gave rise to this action. On that date, Hyman Erdwein died.[1] The opinion of Trial Judge Louis Spector, filed July 27, 1976, vindicated plaintiffs efforts to overcome the adverse actions, but plaintiff did not live to know it. The trial judge found that plaintiff was entitled to back pay for both the time he was suspended[2] from duty and the aftermath of his subsequent dismissal, because the charges underlying those adverse actions were utterly without merit. Defendant does not contest the trial judge’s disposition of the claim regarding dismissal, but now brings the case here on request for review of the opinion insofar as it contemplates award of back pay during the period of suspension. We reach virtually the same result as did the trial judge on this point, though by a different course.
Since our conclusion rests in part on facts as found by the trial judge, disclosing the Government’s failure at all stages of the proceedings in plaintiffs case to bring forward any credible evidence implicating him in wrongdoing, we set out those facts at length, borrowing heavily from the *57 trial judge’s findings and opinion.[3] Plaintiff was first employed by the Department of Agriculture on November 17, 1941, and served continuously in that department (except for his military service during World War II) until his suspension effective March 18, 1965, and his subsequent removal 3 years and 7 months later on October 19, 1968. He had been a career civil servant, with entitlement to veterans’ preference.
At the time of his suspension and subsequent removal, plaintiff was classified as a meat inspector, GS-9, in the Marketing and Consumer Services Meat Inspection District Office at New York City. He had at that time about 24 years of satisfactory service as a meat inspector and was considered competent, diligent, trustworthy, and reliable by his superiors. He had received a sustained superior performance award in 1962, and in his union, the American Federation of Government Employees, plaintiff was currently serving as president of the Eastern Council of AFGE locals.
When the events hereinafter described took place on December 11, 1964, plaintiff was on duty as a meat inspector at the Merkel, Inc., plant, and across the street at the A & P facility, in Jamaica, New York. The Merkel plant was at that time the largest meat processing facility in the New York metropolitan area.
Plaintiff had been assigned to the Merkel plant, along with two other inspectors (Messrs. Thompson and Fellner) since June 1964. One of the reasons plaintiff had been assigned to Merkel was that the Marketing Service had received some complaints about the plant and wanted competent inspectors on duty to control operations. Plaintiff had a reputation for being strict, but for providing good inspectional results. The huge Merkel plant was divided into three duty stations, namely, the two upper floors, the first floor and basement, plus the A & P facility, and all night operations. On December 11, 1964, plaintiff was assigned to first floor, basement, and the A & P facility, *58 Fellner was assigned to the upper two floors, and Thompson supervised all night operations.
Plaintiff reported for work at 7 a.m. on Friday, December 11, 1964. From Monday through Thursday (December 7 through 10) he had not been at the plant, but had been in Washington, D.C., for a labor management meeting with Department of Agriculture officials. On December 11, the day of plaintiffs return from Washington, the commissioner of the New York Department of Markets, Albert S. Pacetta, had been asked by the Manhattan district attorney’s office to conduct a search at the Merkel plant on a tip that contaminated meat or horsemeat was being processed there as frozen beef. About noon that day, the commissioner called the Manhattan office of the U. S. Department of Agriculture and asked a Dr. Abbie J. Logie, then assistant inspector in charge of the New York Station Meat Inspection Division, for an inspector to accompany him on an important matter at the Merkel plant which Pacetta declined otherwise to describe. Dr. Logie advised that he would be unable to provide anyone at that time, but later that afternoon he was able to contact a Dr. Irving J. Kahn by telephone, and Dr. Kahn, a veterinary supervisor, was the one who eventually went to the Merkel plant as hereinafter related.
Commissioner Pacetta arrived at the Merkel plant in the middle of the afternoon of December 11, accompanied by about six members of his staff. He entered the premises from the rear, in the area of the shipping and receiving dock, and told Merkel employees that he was assuming jurisdiction over the plant to conduct an inspection. He directed his staff to stop all traffic and to secure the premises.
Plaintiff came to the shipping and receiving dock, identified himself as a federal inspector, and was advised by Pacetta that he was looking for a shipment of about 500 fifty-pound boxes suspected of containing horsemeat. Plaintiff and Inspector Fellner then accompanied Pacetta and his staff as they searched freezers and coolers in an effort to locate the boxes. At freezer No. 3 in the basement, they found a pile of boxes pushed together on skids in one corner. They were labeled "beef trim.” Plaintiff requested *59 Merkel employees to open the boxes, and after examination advised those present that the meat was not beef trim because it was in solid chunks. Plaintiff informed Pacetta that this must be the shipment he was searching for, and he added that in his opinion there were more than 500 boxes. Pacetta agreed, and then disclosed that he was actually looking for about 700 boxes.
Plaintiff left the freezer and immediately called his main office from a nearby phone in the hall. He spoke to Dr. Logie informing him that Pacetta was at the plant, and that plaintiff had been asked whether he could identify the frozen meat as horsemeat. Plaintiff told Dr. Logie the product looked suspiciously like horsemeat. Because positive identification was impossible without a laboratory test, Dr. Logie instructed plaintiff to take samples for submittal to the Beltsville, Maryland, laboratory for seriological examination. Pacetta was then advised that the federal inspectors would take samples. Some frozen blocks were put through a frozen meat cutter and samples were put in plastic bags by Inspector Fellner. Thereafter, plaintiff engaged in a search for the invoices or receiving tickets relating to the suspect meat. Later that day, shortly after 5 p.m., Inspector Fellner also spoke to Dr. Logie to advise him that a total of approximately 790 boxes were involved, according to a receiving ticket which had meanwhile been produced as a result of plaintiffs efforts.
Plaintiff had no advance knowledge or notice of the suspected shipment, nor of its movement into the Merkel plant, presumably on the previous day. As earlier stated, he had been in Washington, D. C., during the prior 4 days.
While the investigation was in progress, Norman Lokietz, president and co-owner of Merkel, arrived and asked what was occurring. When informed, he demanded that the suspect meat be removed from his plant. Pacetta refused to permit its removal. After discussion and movement of some meat back and forth, the suspect product was consolidated in freezer No. 3, and isolated so that no intermingling with other boxes of meat could occur. Later that day, between 6 p.m. and 6:30 p.m., Inspector Fellner secured that freezer with a numbered, metal, USDA seal pending further orders from Pacetta or his *60 department. In addition, Pacetta’s staff affixed a paper seal to the freezer door.
About 4:30 p.m., plaintiff received a call from the A & P facility, which was part of his duty station. He was advised that they were finishing their operation for the day, so he went across the street, locked up the USDA brands, checked for edible fat content, and then returned to the Merkel plant. About 5 p.m. Commissioner Pacetta indicated that he wished to leave, and plaintiff directed him toward the back platform. Plaintiff then went upstairs toward his office in the plant. As Pacetta was leaving, the aforementioned Dr. Kahn was arriving in response to Dr. Logie’s earlier-described call.
Subsequent events put the time of Pacetta’s departure at issue. The trial judge concluded that this occurred between 5 p.m. and 5:30 p.m., a finding which defendant does not dispute. When Dr. Kahn arrived, he was met by plaintiff. Together they inspected the boxes which had been isolated in freezer No. 3, and Dr. Kahn then directed the federal inspectors to pack the samples of suspect meat in dry ice for shipment to the Beltsville laboratory on the following Monday. Plaintiff remained with Dr. Kahn until shortly before 6 p.m., following which he changed clothes, made his final report entries, signed out on his time slip, and left the Merkel plant shortly after 6 p.m. Dr. Kahn also left shortly after 6 p.m.
Plaintiff proceeded to his car parked across the street and drove to Greenport, Long Island, located nearly 100 miles away at the northeast end of Long Island. This was late on a Friday and traffic conditions were typically heavy and roads clogged with commuters and others leaving the city for points east. Plaintiff arrived in Greenport at 9 p.m. He stayed there for two nights of union meetings, and did not return to the Merkel plant on Saturday, December 12, 1964. Meanwhile, Inspector Fellner remained at the Merkel plant until shortly after 7 p.m. on December 11, at which time he was relieved by the night inspector, Thompson, who had arrived about 6:30 p.m. On the next day, Saturday, December 12, 1964, Inspector Fellner returned to the Merkel plant to count the boxes which had been embargoed. He found the seals which had been placed *61 on the door had been broken, and this was explained to him.[4] He then counted the 790 boxes of embargoed meat. These boxes are not in issue.
At some time after Commissioner Pacetta left the Merkel plant, certain Merkel employees met with Norman Lokietz and made plans to move and did move some other frozen meat, which probably was horsemeat. This meat had neither been seen nor embargoed by Commissioner Pacetta and Department of Agriculture inspectors. The trial judge found the record entirely devoid of credible evidence that plaintiff knew about this meat or could have or did take part in the employees’ meeting or in any planning at that meeting for removal of it later that evening. Equally lacking, the trial judge found, was probative evidence that plaintiff could have been or was aware that such plans were being made by others or that the suspicious meat was removed.[5] Again, defendant does not contest the trial judge’s determination.
The adverse actions of which plaintiff complains grew out of an indictment returned by the grand jury of the county of New York on March 10, 1965, charging Charles Anselmo (supplier of the suspect meat to Merkel), Norman Lokietz, Inspector Fellner, and plaintiff with conspiracy to obstruct justice. By letter dated March 16, 1965, plaintiff was advised that he was suspended without pay effective March 18, until the outcome of the proceedings resulting from the indictment was known or until the Agriculture Department had completed its own investigation into the matter. The letter stated in part:
In the event that the legal proceeding against you and the investigation disclose no misconduct on your part *62 which would warrant serious disciplinary action, this suspension action will be canceled and all references thereto removed from your official record, and pay otherwise due you will be restored. [Emphasis supplied.]
Plaintiffs suspension was temporarily lifted, from March 31 through June 4, 1965, to allow exhaustion of his accumulated annual leave. Then, by letter dated May 28, 1965, defendant reimposed the suspension effective June 5, reiterating in that letter the above-quoted assurances of correction of records and restoration of pay. Plaintiff immediately protested the suspension and asked for a hearing and restoration to duty pending the hearing. However, action on this request was also held in suspension, until completion of the criminal proceedings or the Department’s investigation.
On June 18, 1968, about 3 years and 3 months after its issuance, the indictment against plaintiff was dismissed by the Supreme Court of the State of New York, County of New York, on motion of the district attorney. Plaintiffs attorney promptly advised the Civil Service Commission of the fact on June 20, requesting that the Agriculture Department be directed to restore plaintiff to active duty retroactive to the date of his suspension.
The Government’s response was a letter to plaintiff dated July 2,1968, proposing to remove him on two charges of misconduct. The first charge was based on the same circumstances underlying the indictment dismissed on June 18. This charge was divided into two parts. The first part accused plaintiff of attending a meeting in Norman Lokietz’ office during the afternoon or evening of December 11, 1964, of advising those present of the location of 62 or 67 boxes of meat similar to those previously embargoed by Commissioner Pacetta and the federal inspectors, and of suggesting that the meat "should be gotten rid of by immediate processing or movement since Mr. Pacetta had not seen or raised a question about these boxes.” The second part of this charge accused plaintiff of permitting Merkel people to ship the described meat, by failing to prevent such shipment.
The second charge was a new matter, not previously raised. It accused plaintiff of accepting gifts, gratuities, and *63 favors in 1964, alleging that on four specified occasions he had received theatre tickets from Merkel. It is true that Merkel provided the tickets, when plaintiff placed orders for them through Norman Lokietz, but it has been established administratively, and the trial judge found (again without present opposition from defendant), that on each occasion plaintiff paid full cash for the tickets, which included the price of the ticket plus the brokerage fee involved.
Plaintiff replied in writing to these charges on August 7, 1968, denying them in full. He asserted that the first charge was vague and lacking in specificity, and that the second did not describe conduct contrary to regulations. An oral reply was made on September 25, 1968, before Dr. C. F. Diehl, director of the Northeastern District Meat Inspection Office at Philadelphia. It was Dr. Diehl’s understanding that his function as an "oral reply officer” was to listen, report, and recommend. It was his further understanding that the purpose of the oral reply was to aid an aggrieved employee who could not write well. In this way, he felt, the employee could reply orally to someone in the Department, who could then send it to higher authority in writing.
Dr. Diehl was not supplied with any information, documents, or evidence other than the charges. He declined to make a recommendation at all on the first charge (suggesting and permitting removal of the meat) because he felt that he did not have enough information to make a recommendation on it, though he questioned the validity of the charge in his report.
On the second charge, Dr. Diehl drew on his own general, personal experience to the effect that "getting theatre tickets in the open market is difficult and usually at much higher prices.” On the basis of that personal impression, he concluded that obtaining them constituted a favor.[6] He *64 recommended that plaintiff be removed on this second charge. Thereafter, by notice dated October 11, 1968, the director of the agency’s personnel division advised plaintiff that the charges were "proved” and warranted his removal. He was thereupon removed effective October 19, 1968.
In response to plaintiffs timely appeal of the dismissal action, the agency scheduled a hearing for January 21, 1969, at which 14 witnesses appeared for plaintiff, and two on behalf of the Government. The hearing examiner, Herbert L. Perlman, sustained plaintiffs removal, but did so on reasoning exactly the opposite of Dr. Diehl’s. Acknowledging that his findings were not free from doubt, the examiner upheld the agency on the first charge, concluding • from the evidence that plaintiff did not "account for all his time that afternoon” of December 11, 1964, so as to negate his attendance at the meeting in Norman Lokietz’ office. However, on the second charge, he found that "the agency has failed to sustain its burden of proof that appellant [plaintiff] did not pay for the tickets in issue.” He declined to rule on whether plaintiffs acquiring the tickets through Merkel constituted a favor in violation of regulations, for "such determination is not our function in this proceeding.”
Plaintiff then appealed to the Civil Service Commission’s New York office. After a hearing, the Commission’s *65 regional director, in a decision dated March 30, 1970, refused to disturb plaintiffs dismissal.[7] He did not think that there was sufficient support in the evidence to say that plaintiff either called the additional suspect meat to the attention of Merkel’s officials or suggested that they remove it from the premises, but he nonetheless upheld the first charge against plaintiff because "it was incumbent upon appellant to place other Anselmo meat under restraint if he was suspicious in any way.” He thus reasoned that plaintiff had failed to prevent removal of the suspect meat, as alleged in the second specification under the charge, although he did not explain why, on the evidence before him, plaintiff was or should have been "suspicious in any way.” He also held that the second charge constituted a basis for dismissal, since in his opinion the manner in which plaintiff obtained the theatre tickets amounted to the acceptance of a favor in violation of regulations even though, as he concurred with the agency’s examiner, plaintiff had paid for the tickets.
The Commission’s Board of Appeals and Review affirmed the regional director’s decision on August 17, 1970.[8] *66 Observing that while plaintiffs conduct in obtaining theatre tickets "might not, in and of itself, warrant removal,” when it was considered in connection with the sustained portion of the first charge, namely, that "on December 11, 1964 Mr. Erdwein permitted Merkel, Inc., to ship out cartons of meat of the same type” that was under suspicion, "the Board comes to the inescapable conclusion that the agency’s action in removing Mr. Erdwein was not arbitrary, capricious or unreasonable, but was taken for such cause as will promote the efficiency of the service.” On July 27, 1971, after reviewing a memorandum submitted to it by plaintiff, the Civil Service Commission declined to reopen and reconsider any previous decision made in the case.
In brief summary, at the end of his very long and confusing travail, plaintiff found himself removed on the basis of charges bearing little resemblance to the charge used to launch his suspension, over 3% years earlier. On the occasion of his first opportunity to plead his case before an "oral reply officer,” that official declined to make even a recommendation on the original charge, because of lack of information. Instead, he relied on his own personal experience, not on a record, to sustain a newly surfaced second charge. This second charge was based on events alleged to have taken place about 4 years earlier. It was on the basis of the recommendation of the oral reply officer that plaintiff was removed effective October 19, 1968.
Plaintiffs second opportunity to defend against the charges, before a hearing examiner designated by the agency, resulted in erosion of the second charge which Dr. Diehl had found appealing. Mr. Perlman found that the agency had failed to sustain its burden of proving plaintiff did not pay for the tickets. He therefore declined to make any finding on that charge. But he made a finding on the first charge, concerning which Dr. Diehl had declined to make a recommendation. The reasoning underlying his finding is extremely weak, and is acknowledged by Perlman himself as not free from doubt.
*67 As a result of the only Civil Service hearing, one provided by the New York regional office, the regional director eroded the first charge by finding, as he had to find, that there was insufficient credible evidence to support the first and more serious part of that charge. Then, although it would require the very same evidence which he had just rejected, in order to sustain the second part of that charge (namely, that plaintiff was aware by attendance at the meeting or otherwise of additional suspect meat, and later witnessed or was aware of its removal, but failed to prevent it, although he was not there at the time), the regional director saw fit to sustain that remnant of the first charge. That, coupled with the second charge (which he upheld), led him to the opinion that the agency decision to remove plaintiff was justified. Finally, the Board of Appeals and Review further retreated from positions previously taken. Although the board recognized that obtaining theatre tickets "might not in and of itself, warrant removal,” it nevertheless concluded that this counseled removal when considered in connection with the sustained portion of the first charge.
The trial judge found that the portion of the first charge just referred to was not supported by any credible evidence, but only by speculation and conjecture. He further found that the second charge did not constitute a basis for removal.[9] Based on all the evidence, including the trial record, the trial judge concluded that the decision to remove plaintiff was arbitrary, capricious, and not supported by substantial evidence. Giles v. United States, 213 Ct. Cl. 602, 605, 553 F.2d 647, 649 (1977); Urbina v. United States, 209 Ct. Cl. 192, 530 F.2d 1387 (1976); Ciambelli v. United States, 198 Ct. Cl. 240 (1972); Reil v. United States, 197 Ct. Cl. 542, 456 F.2d 777 (1972). Upon our findings and conclusion, plaintiff is entitled to back pay for the period from his dismissal to the date of his death.
Plaintiff also asks us, as he asked the trial judge, to award him back pay for the time he was suspended from *68 duty pending the outcome of the indictment and the Agriculture Department’s investigation.[10] The trial judge recognized that our holding in Jankowitz v. United States, 209 Ct. Cl. 489, 533 F.2d 538 (1976), raised a problem for plaintiff on this point, for it allowed an agency to impose an indefinite suspension without pay upon an employee under indictment, solely on the fact of the indictment, without incurring liability for back pay upon resolution of the criminal proceeding favorably to the employee. Accord, Koontz v. United States, 213 Ct. Cl. 762, cert. denied, 434 U.S. 984 (1977). This rule fits plaintiffs case exactly, so as to deny him entitlement to back pay for the period of his suspension, unless a further refinement of the holding in Jankowitz based on the special facts of this case would command otherwise. The trial judge would have us make that refinement, holding as he did that Jankowitz is subject to a rule of reason, so that a suspension without pay is not unjustified or unwarranted [11] if it is not imposed for loriger than a reasonable period of time. He concluded that plaintiff was suspended for an unreasonably long period, for the agency could have completed its investigation and acted to remove him well before the dismissal of the indictment over 3 years after he was first suspended, and accordingly determined that plaintiff was entitled to back pay for the time he was suspended, less a reasonable period for the agency to conduct its investigation. The trial judge thought that 6 months was a reasonable time.
We see no need to travel the route that the trial judge has mapped out for us, nor to agree with plaintiffs counsel that back pay should be awarded for a suspension founded on an indictment that ultimately appears to have been totally without warrant. Rather, we hold that plaintiff is entitled to be paid for the full period of his suspension, simply because this is precisely what his agency promised him. As we noted above, his notice of suspension, March 16, 1965, reiterated by defendant on May 28, 1965, assured plaintiff that "pay otherwise due you will be restored” if neither the criminal proceedings against him nor the *69 Department’s own investigation disclosed "misconduct on your part which would warrant serious disciplinary action.” Obviously, the criminal proceedings disclosed no such misconduct, for the indictment was dismissed on motion of the state.
Likewise, the Department’s investigation, the fruits of which were displayed in the administrative hearings and the trial in this court, yielded no credible evidence of wrongdoing or violations of regulations on plaintiffs part that could fairly lead to the imposition of serious disciplinary action. As thoroughly shown in the facts we have previously set forth in considerable detail, plaintiffs agency possessed, from its investigation and otherwise, no hard evidence that plaintiff was present at the Merkel employees’ meeting, knew about it contemporaneously, had knowledge or counseled removal of other suspect meat, knowingly or even negligently permitted the removal of meat that did occur, or ever accepted anything of valué from Merkel that constituted a favor in violation of regulations, whether or not in connection with the meat removal. Defendant has not excepted to any of the trial judge’s findings on the foregoing. We therefore take it as established that the agency had no basis in fact or law upon which to proceed against plaintiff in the manner that it did in mid-July 1968.
There having been no disclosure of serious misconduct on plaintiffs part, the agency’s assurance that "pay otherwise due you will be restored” must be honored. We read the letter of suspension to have imposed a suspension without pay which had a condition attached to it. The condition was that the suspension would remain payless if and only if either the criminal proceedings or the agency’s investigation produced proof of misconduct. Since neither ultimately yielded such proof, according to the letter’s own terms, the suspension must retroactively be treated as one with pay. The condition of nonpayment was not fulfilled, and so, the pay otherwise due to plaintiff for the period of his suspension must be restored to him. Thus, plaintiffs award of back pay is held to include the pay he would have received while suspended from duty, had he been suspended with pay. This result, based on the assurances *70 given plaintiff in defendant’s letters imposing his suspension, grants plaintiff all the monetary relief he requested, and actually exceeds the back pay he would have been awarded had we followed the trial judge’s approach.
In view of the foregoing disposition of the case, it is unnecessary for us to reach plaintiffs assertion of various procedural errors. Cruz-Casado v. United States, 213 Ct. Cl., 498, 502, 505, 553 F.2d 672, 675, 676 (1977). For the reasons given in the opinion and the findings therein, the court concludes as a matter of law that plaintiff is entitled to back pay for the heretofore unpaid period of his suspension, March 18 through March 30, 1965, and June 5, 1965, through June 18, 1968,[12] and for the period from the date of his removal, October 19, 1968, to the date of his death, January 27, 1976. The amount of the recovery and the appropriate collateral relief to which plaintiff is entitled, subject to such offsets, if any, as are applicable, will be determined in further proceedings in accordance with Court of Claims Rules 131(c) and 147(c), respectively.

 His widow and administratrix has been substituted as party plaintiff. Ct. Cl. Rule 66(a). However, references to plaintiff herein will mean Hyman Erdwein.

 Except for the period from March 31 through June 4,1965, when his suspension was lifted to permit exhaustion of his accumulated annual leave.

 The trial judge’s findings and opinion have been furnished to the parties. The findings are not printed herein since those relied upon by the court, and necessary to the result, are contained in this opinion.

 The seals which had earlier been placed on freezer No. 3 were broken during the night to permit a member of the Merkel staff to ship some processed, nonembargoed meat in the freezer. The 790 boxes of embargoed meat were not disturbed.

 The trial judge based this fact-finding on the absence of either time or motive on plaintiffs part, as disclosed by the record, for him to take part in or know of the employees’ planning or actions. Several witnesses testified that plaintiff had already departed on his trip to Greenport and was not present when the meeting was conducted. The trial judge gave little weight, appropriately, to unsworn statements in the administrative record placing plaintiff at the meeting, statements made by a high Merkel officer and the relatives of two other such officers. Defendant offered no witnesses at trial, but chose to stand on the unsworn statements, which were overwhelmingly contradicted by the live testimony.

 On the basis of the evidence elicited at trial, the trial judge found to the contrary. He stated in his opinion:
"Plaintiff could have obtained the theatre tickets himself through other sources, such as the box office or another agency. He chose to order the tickets through Merkel, as did other inspectors * * *, and Merkel employees, because it was more convenient. Plaintiff did not receive his tickets any sooner by this practice, but ordering them through Merkel would save plaintiff from having to go downtown to *64 reserve or pick up tickets. The tickets ordered were left at the box office in plaintiffs name for pick up on the night of the performance.
"The evidence shows that tickets were readily available on those occasions. In each case they were ordered several weeks in advance, and in order to provide maximum flexibility and availability, plaintiff would request any evening during any week in which he was not working nights.
"A professional ticket agent, engaged in the business since 1947, testified under oath at trial from the results of his research regarding the four performances involved. He testified that they were not sold out for the entire week embracing in each case the date on which plaintiff attended the theatre. The witness testified that by selecting entire weeks within which tickets were acceptable, plaintiff attended shows for which tickets were readily available. The seats were not particularly good and, on one of the four occasions, plaintiff inconveniently attended a show on a night when he was scheduled to work beginning at midnight, because that was a date on which tickets were available.
"It was, moreover, accepted practice for meat inspectors to purchase meats, butcher knives, coats, and other equipment at establishments to which they were assigned, and at the same prices at which employees in the plants could purchase these items. There is no indication that this latter practice was considered a violation of the regulations. The record establishes that plaintiff received no discount or special treatment in the purchase of the tickets involved. * *

 The regional director treated plaintiffs appeal on the March 18 through 30 leg of his suspension as untimely, since it was, in his view, an adverse action of less than 30 days and thus appealable only under the provisions of Civil Service regulations, Part 752-C, within 10 days. Plaintiffs appeal of the suspension did not occur until June 1, 1965, and so was out of time if governed by the cited regulation. We disagree with the director’s opinion (concurred in by the Commission’s Board of Appeals and Review) that the action taken against plaintiff was a temporary one only, for we think it clear that the suspension was indefinite in duration and was contemplated by both sides to be reimposed as soon as plaintiffs accumulated annual leave was exhausted. The director’s technical distinction elevates form over substance, and we decline to follow it. Tri-State Materials Corp. v. United States, 213 Ct. Cl. 1, 11, 550 F.2d 1, 7 (1977). Accordingly, plaintiff had no need to appeal the first leg of his suspension under Part 752-C, and we hold that the appeal that he later did press with regard to the March 18 through 30 period was timely.

 The affirmance contained one exception, not presently before us for review but worthy of note since it will affect the scope of the judgment here. Observing that the Commission’s New York region had advised plaintiff back on July 16, 1965, that it was suspending action on his appeal "until the outcome of the proceedings resulting from the indictment was known or until the agency had completed its investigation surrounding the matter,” the board observed that the "indictment against Mr. Erdwein was dropped on June 18, 1968; however, instead of restoring him to duty, the agency continued him in a non-pay status and on July 2,1968 issued an advance notice of proposed removal * * As a result, the board found "that on June 18, 1968 the agency’s conditions for termination of the indefinite suspension had been met; therefore, Mr. Erdwein was improperly suspended from June 19, 1968 through October 19, 1968.” Plaintiff has been paid for this period.
*66 As for the remainder of the suspension, the board concluded that it "was not arbitrary, capricious, or unreasonable and was for such cause as would promote the efficiency of the service.”

 At most, he found, it was akin to the accepted practice of permitting inspectors to purchase meats, butcher knives, coats, and other equipment at establishments they were assigned to inspect, at the same prices available to plant employees. See note 6, supra.

 Other than the time when he was restored to duty to allow exhaustion of his accrued leave. See note 2, supra.

 Within the meaning of the Back Pay Act of 1966, 5 U.S C. § 5596(b) (19Y0).

 See note 8, supra.