**Otto ENGDAHL, Petitioner,**

v.

**DEPARTMENT OF the NAVY, Respondent.**

No. 89–3326.

United States Court of Appeals, Federal Circuit.

April 17, 1990.

Peter B. Broida, Passman & Broida, Washington, D.C., argued for petitioner.

Hillary A. Stern, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for respondent. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Stephen J. McHale, Asst. Director.

Before NIES, and MICHEL, Circuit Judges, and DUFF, District Judge.[*]

PER CURIAM.

Otto Engdahl appeals the decision of the full Merit Systems Protection Board (Board), sustaining his suspension without pay from employment by the Department of the Navy (Navy or government). *See Engdahl v. Department of the Navy*, 40 M.S.P.R. 660 (1989) (final decision). Because we conclude the suspension was lawful under the Civil Service Reform Act of 1978 and did not violate Engdahl's due process rights under the fifth amendment, we affirm.

[*] The Honorable Brian Barnett Duff, District Judge, United States District Court for the

## BACKGROUND

Engdahl held a position as an electrician at the Naval Air Development Center in Warminster, Pennsylvania. On November 19, 1987 he was arrested at the Naval base by local and state police and charged with rape, involuntary deviate sexual intercourse, statutory rape, unlawful restraint, incest, corruption of a minor, indecent assault, indecent exposure, endangering the welfare of a child, aggravated assault, simple assault, and open lewdness. The complainant was his sixteen-year-old daughter. At a preliminary hearing, although the charges of rape, statutory rape, and incest were dropped, the remaining charges were all upheld. On December 2, 1987 Engdahl posted bail and was released.

The next day when he reported to work he was placed on administrative leave (non-duty/with pay) until further notice. *Engdahl v. Department of the Navy*, No. PH07528810186, slip. op. at 2 (MSPB July 21, 1988) (initial decision). On December 28, 1987 Engdahl met with a government official to discuss potential adverse employment action based on the government's concerns arising from the criminal charges against him and the acts underlying them. On January 7, 1988 Engdahl received notice that the government intended to suspend him without pay. Engdahl was then provided an opportunity to reply, which he personally did to government officials on January 25. Engdahl's counsel participated via a telephone conference call. *Id.* at 2-3; Brief for the Department of the Navy at app. 65, *Engdahl v. Department of the Navy*, No. 89-3326 (Fed.Cir. filed Nov. 9, 1989) [hereinafter Brief]. The government issued a decision letter on January 29, 1988 suspending Engdahl without pay, effective February 1, 1988. *Engdahl*, slip op. at 3.

On February 22, 1988 Engdahl pleaded guilty to corruption of a minor, indecent assault, and endangering the welfare of a child. He also pleaded nolo contendere to

Northern District of Illinois, sitting by designation.

indecent exposure, open lewdness, unlawful restraint, and two counts of simple assault. *Id.* The government became aware of the pleas the next day. 40 M.S.P.R. at 663. After confirming the pleas, the government scheduled an investigative conference with Engdahl for February 29. Following that discussion, the government issued a notice of proposed removal on March 9. *Id.* at 663–64. Engdahl was removed on June 17, 1988 after requesting and receiving four extensions of time for his reply to that notice. *Engdahl,* slip op. at 9.

Engdahl appealed the suspension to the Board claiming that it was violative of section 7501 of the Civil Service Reform Act of 1978 and his fifth amendment due process rights. The Administrative Judge (AJ) sustained the suspension from February 1 until February 22, 1988, but concluded that the government had unreasonably delayed the initiation of removal proceedings following his criminal conviction. The AJ therefore determined that Engdahl's suspension was continued unlawfully until his removal in June. Consequently, he cancelled Engdahl's suspension from February 22, 1988 forward. *Engdahl,* slip op. at 13.

The government petitioned for review by the full Board and Engdahl cross-petitioned. The Board granted review and upheld the suspension from February 1 to February 22. 40 M.S.P.R. at 661. In addition the full Board concluded, reversing the AJ, that continuing the suspension thereafter was lawful because the approximately fifteen-day period following Engdahl's pleas was a "reasonable" time for the government to investigate and to initiate the removal action. *Id.* at 664. Engdahl now appeals his suspension as to both the period before his pleas, February 22, and the period after.

### ISSUES

(1) Whether the government may suspend an employee without pay for "protective" purposes pursuant to sections 7501, 7511, and 7512 of the Civil Service Reform Act of 1978 concerning "disciplinary" suspensions?

(2) Whether the due process clause of the fifth amendment prohibits the government from suspending an employee without pay, pending the disposition of criminal charges, after the government has demonstrated a nexus between the charges and the employee's duties?

(3) Whether the government may continue a suspension without pay after the resolution of criminal charges against the employee to investigate, propose, and finalize his removal?

### OPINION

#### I. *Jurisdiction*

The Civil Service Reform Act of 1978 (Act) provides that federal employees may appeal to the Board certain adverse actions, including "suspension" for more than fourteen days. *See* 5 U.S.C. §§ 7511–7513 & 7701(a) (1988). The Act defines suspension as "the placing of an employee, for *disciplinary* reasons, in a temporary status without duties and pay." *Id.* § 7501 (emphasis added). This court previously analyzed the meaning of this definition and held that suspensions that were authorized and reviewable include those ordered "because the agency believes that the employee's retention on active duty could ... be detrimental to governmental interests, or be injurious to the employee, his fellow workers, or the public." *Thomas v. General Servs. Admin.,* 756 F.2d 86, 89 (Fed. Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). We further stressed in *Thomas* that "disciplinary" was intended "in the broader sense of maintaining the orderly working of the Government against possible disruption by the suspended employee...." *Id.*

■ In the instant case, the Board found Engdahl was suspended because the Navy lost confidence that he could safely perform his duties, which involved access to the Naval base's households with children, and because of the concern that his presence on the job would adversely affect the job performance of his female co-workers, who were apprehensive of him. *Engdahl,* 40 M.S.P.R. at 662. The government's ac-

tion was clearly intended to alleviate potential "disruption" Engdahl caused to the government's operations and to prevent potential injury to female co-workers and Naval base residents, especially minors. These purposes fall within section 7501's term "disciplinary" as interpreted in *Thomas*. Accordingly, the suspension was pursuant to the Act, and therefore was appealable to the Board.

This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1982) because the Board had jurisdiction under 5 U.S.C. §§ 7511–7513 and 7701(a) (1988). We review the Board's action only to determine whether it was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, obtained without procedures required by law, rule or regulation, or unsupported by substantial evidence. *Id.* § 7703(c); *see Hayes v. Department of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir. 1984).

## II. *The Act*

Engdahl argues that he was suspended for the purpose of protecting the government against embarrassment and disruption of the efficiency of the service that may occur when an employee is publicly known to have been charged with criminal activity. He asserts that these are "protective" rather than "disciplinary" reasons, and that the Act authorizes only disciplinary suspensions. Accordingly, Engdahl challenges the suspension as "not in accordance with law."

Engdahl essentially asks us to reevaluate the meaning of "disciplinary." As noted *supra*, this court held in *Thomas* that Congress intended "disciplinary" to have a broader meaning than Engdahl suggests. Moreover, we are unpersuaded by his argument that *Thomas* is inapposite to this issue because it involved a different factual situation. In *Thomas*, this court explained the scope of section 7501 and specifically construed the meaning of "disciplinary." *Thomas* controls here, and accordingly we conclude that the Board properly determined that the government's action was in accordance with the law, i.e., section 7501.[1]

## III. *Procedural Due Process*

Engdahl also claims that his right to procedural due process under the fifth amendment was violated. Assuming, without deciding, that Engdahl had a protected property interest in not being suspended from federal employment without pay,[2] we conclude that the government did afford him procedural due process.

At a minimum, due process requires that an individual being deprived of his property interest be given "an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Nonetheless, to determine exactly what process is due in any particular case, a more exacting analysis must be conducted that considers the particular circumstances and interests involved. *Id.* 424 U.S. at 334, 96 S.Ct. at 902; *see Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). More specifically, three factors are to be considered: (1) the individual's interests affected by the government's adverse action; (2) the government's interests; and (3) the risk of an erroneous decision and whether more accurate procedures might not reduce that possibility. *Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

No doubt, Engdahl had significant interests that were substantially affected. Suspension for cause without pay is likely to cut off subsistence income and to prevent one from obtaining other gainful employment. Although temporary, such a suspension has great practical impact on the employee.

---

1. If Engdahl's position were correct, the suspension would not be an action appealable to the Board under section 7512, and this appeal would be dismissible for lack of jurisdiction.

2. *See, e.g., American Fed'n of Gov't Employees v. Office of Personnel Management*, 821 F.2d 761, 767 (D.C.Cir.1987) (addressing whether due process was provided without first determining whether a property interest existed).

The government's interests, however, were far more substantial. First, female co-workers were apprehensive about working around Engdahl and accordingly the Navy was concerned that the co-workers' job performance would be affected. 40 M.S.P.R. at 662, 665. Their concerns were especially understandable because the charges against Engdahl involved acts of sexual violence against a female. Second, the government was legitimately concerned for the personal safety of its Naval base residents, including "many children." *Id.* Consequently, the government lost confidence in Engdahl's ability to perform his duties without adverse effects on the efficiency of the service and the safety of particular base residents. Third, the government was concerned that permitting an employee to continue performing his duties when that employee faces criminal charges that have become notorious, partly through press coverage, would reflect poorly upon the government and would likely diminish public confidence in governmental operations. *See* Brief, *supra,* at app. 64. Although any one of these three concerns of the government might be sufficient to justify suspension of an employee, we need not decide that in this case. It is the combination of the concerns that led to Engdahl's suspension, and therefore it is the combination we review to decide whether substantial evidence supports the Board's decision concluding the Navy had a justifiable concern for the efficiency of the service. We conclude that substantial evidence supports that decision.

Moreover, the procedures followed before Engdahl was deprived of pay provided him ample opportunity to persuade the government that its concerns were ill-founded. Engdahl was placed on administrative leave (non-duty/with pay) for a short period of time pending the decision whether to suspend. During that time he met with a government official to discuss potential adverse action based on the government's concerns arising from the charges against him. Additionally, after he received notice of proposed suspension, he was provided an opportunity to "personally and/or in writing" submit a reply dis-puting the grounds for suspension. Brief, *supra,* at app. 64. In addition to a written reply, Engdahl personally met with government officials. He even had legal representation via a telephone conference call during that meeting. *Engdahl,* slip op. at 2–3.

Engdahl argues that the government denied him due process in not permitting him to directly rebut the allegations of criminal activity contained in the charges. There is nothing, on the record before us, however, that indicates that, assuming such an opportunity was constitutionally required, it was denied. In any event, once he pleaded guilty, any question about guilt became moot.

■ Engdahl failed to comply with the Federal Rules of Appellate Procedure in that he did not provide citations to the record to support this argument. *See* Fed. R.App.P. 28(e). Additionally, we are unable to locate any evidence in the record before us that supports Engdahl's position. When the government was considering Engdahl's suspension, a meeting was scheduled with him. At that meeting, Engdahl did challenge the validity of the charges as evidenced by the government official's summary of Engdahl's statements. Brief, *supra,* at app. 62. Moreover, after Engdahl received his notice of proposed suspension, he was provided an opportunity to reply. There is no indication he tried to present evidence that he was innocent of the crimes charged or that the government did not let him. *See id.* at app. 65–67. The record merely shows that Engdahl was represented by counsel and that a number of *legal* arguments were made by counsel. *See id.* In the absence of a factual predicate, we simply need not reach the legal argument advanced here by Engdahl. Again, the argument has no application for the period beyond February 22 when he pleaded guilty.

■ Engdahl also argues that the procedures utilized by the government were insufficient, claiming that the Navy was required to conduct an independent investigation as to whether he actually committed

the crimes for which he was charged by state authorities. We reject Engdahl's argument, however, because this alternative procedure would not have greatly reduced the risk of an erroneous decision without undue hardship to the government, other employees, and base residents and without potential prejudice to Engdahl's own interests. *See Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. Nor did Engdahl offer any authority that supports his contention that an independent investigation is constitutionally required.

Here, the government followed the widespread policy of not conducting personnel investigations into an employee's activities already being investigated by criminal law enforcement agencies. *See, e.g., Brown v. Department of Justice,* 715 F.2d 662, 664, 668 (D.C.Cir.1983); *Polcover v. Secretary of Treasury,* 477 F.2d 1223, 1232 (D.C.Cir.), *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). It is not the responsibility of all government agencies to investigate criminal activity of their employees and generally they are neither authorized nor funded to do so. Moreover, an investigation by the employing government agency could even result in "improper interference with the criminal proceedings" or could prejudice the employee's criminal defense. *See Peden v. United States,* 512 F.2d 1099, 1103, 206 Ct.Cl. 329 (1975); *Cohen v. United States,* 369 F.2d 976, 988, 177 Ct.Cl. 599 (1966), *cert. denied,* 387 U.S. 917, 87 S.Ct. 2029, 2030, 18 L.Ed.2d 969 (1967). In the instant case, the Navy chose not to investigate Engdahl's alleged crimes. We agree with the Board that neither the Constitution nor any statute required it to do so.

One thing the government must do, however, is give employees it seeks to suspend the opportunity to challenge the alleged nexus between the crime of which they are accused and the efficiency of the government service.[3] The government, however, need not provide a full evidentiary hearing

in order to afford due process, but may place reasonable limits on an employee's "opportunity to be heard" based on the circumstances surrounding the type of case. *See Eldridge,* 424 U.S. at 348–49, 96 S.Ct. at 909–10; *Goldberg v. Kelly,* 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970).

According to the record before us, the government provided Engdahl the opportunity to rebut the basis of the proposed suspension at the meeting scheduled specifically for him to reply to the notice. He had the opportunity to dispute the nexus between the charges against him and the efficiency of the service. It appears he neither sought to nor was prevented from doing so. Consequently, we conclude that Engdahl was not denied any procedural opportunity to present evidence required by the due process clause that he had not waived.

## IV. *Substantive Due Process*

■ Engdahl also claims that his right to substantive due process under the fifth amendment was violated. He asserts that his initial suspension *without pay* was much too onerous given that prior to his guilty plea there was only "reasonable cause" to believe that he had committed a crime. Engdahl's argument has several flaws. First, although he has the burden of persuasion, Engdahl has failed to provide any authority supporting his proposition. Engdahl cites *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), as mandating that government employers suspend *with pay* when acting because of "protective" concerns. He points particularly to the Supreme Court's statement that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it *can* avoid the problem by suspending with pay." *Id.* at 544–45, 105 S.Ct. at 1494 (footnote omitted) (emphasis added). This statement, how-

---

**3.** We need not decide whether a federal employee is entitled to an opportunity to challenge more than this. As noted *supra,* Engdahl failed to provide a record that he attempted to offer evidence on any broader issues and that the

agency denied him the opportunity. Because he failed to establish a factual predicate that he tried to litigate issues beyond nexus, any discussion here of what other issues he may have been entitled to raise, if any, would be dicta.

ever, was clearly dicta. *See id.* at 545 n. 10, 105 S.Ct. at 1495 n. 10. Moreover, the language, "can," is merely descriptive, not normative. We agree that in the instant case, the government *could* have suspended with pay. Nevertheless, we cannot read *Loudermill* as holding that the government *must* suspend him *with pay.*

Additionally, Engdahl's suspension without pay rests not only on the formal charges, but also on the proven nexus between the acts charged and the efficiency of the service. We conclude that there is substantial evidence to support the nexus found by the Board and the government: The Navy was concerned about Engdahl's co-workers' job performance because they were apprehensive about working around him, and the Navy was concerned about protecting minors residing on the base, as well as maintaining public confidence in its management of the base.

## V. *Delay of Removal and Suspension Pending Removal*

■ Finally, Engdahl asserts that even if it were initially proper, the suspension should have been lifted immediately upon resolution of the criminal charges. He argues that no investigation as to whether he committed a crime could exist once he entered his pleas and that suspensions can only be instituted pending investigations into misconduct. We conclude, however, that the original suspension was properly continued after the guilty pleas because Engdahl (1) had previously been provided notice that the suspension might continue past the resolution of the charges while the Navy investigated further administrative

action against him, and (2) the Navy acted within reasonable time periods in considering, proposing, and finalizing his removal. In any event, Engdahl has shown no applicable authority that an administrative personnel inquiry cannot continue past conclusion of the criminal investigation and resolution of the charges.[4]

Engdahl also argues that the Navy acted too slowly. Engdahl entered pleas of guilty and nolo contendere on February 22, 1988, and the Board found that the government was aware of this on February 23. 40 M.S.P.R. at 663. The government promptly confirmed the pleas and scheduled an investigative discussion with Engdahl for February 29, as required under agency regulations. It then processed Engdahl's proposed removal notice through supervisory and counsel review and issued the notice on March 9. Engdahl was removed on June 17, 1988. His actual removal was delayed because Engdahl's counsel requested and was granted four postponements for submitting a reply. *Engdahl,* slip op. at 9.

Engdahl's suspension did not run longer than specified in the notice of suspension; one of the four alternative conditions subsequent was that the suspension would "remain in effect until ... [it can be determined if] there is sufficient evidence ... to support an administrative action against [Engdahl]." *See* 40 M.S.P.R. at 663. The Navy decided to investigate Engdahl's possible removal because of the pleas he had entered. The Board determined the approximately fifteen-day period following Engdahl's pleas was a "reasonable" time for the government to complete its removal

---

4. We are unpersuaded by Engdahl's suggestion that our decision here is controlled by *Erdwein v. United States,* 215 Ct.Cl. 54 (1977). Engdahl suggests that *Erdwein* held that suspensions must immediately end upon the resolution of criminal charges. Our predecessor court, however, explicitly noted that that issue was not on review in that case. *See id.* at 65 n. 8. Consequently, that court could not have held as Engdahl suggests. Additionally, Engdahl's reliance on *Mercer v. Department of Health and Human Services,* 772 F.2d 856 (Fed.Cir.1985) is also inapposite. In *Mercer,* this court held a portion of a suspension improper because it was continued after the agency learned that its concerns that

led to the suspension were unfounded. *Id.* at 858. Moreover, it is questionable whether the employee, Mercer, was on notice that the suspension might extend as long as it did. In the instant case, however, Engdahl's suspension reasonably remained in effect because the Navy continued to have legitimate concerns that were being investigated and Engdahl was on notice that the suspension might continue after the criminal charges were resolved. Indeed, once he pleaded guilty, its concerns were even greater. The Navy acted reasonably in continuing his suspension while it considered whether the now-proven charges warranted his removal.

review and to initiate the removal action. Based on its determination that the delay in issuing the removal notice was reasonable, the Board concluded that the continued suspension was lawful. *Id.* at 664. Moreover, continuation of the suspension after the removal notice was lawful because the government's investigation could not be finalized until Engdahl had his opportunity to reply and the subsequent decision to terminate could be implemented. This delay was reasonable because it provided Engdahl an opportunity to try to demonstrate that the proposed removal action was ill-founded.[5] Certainly, the government cannot be faulted for the *length* of this delay, which was caused almost entirely by Engdahl's counsel's repeated requests for extensions of time. Accordingly, we hold that the Board's conclusions about the lawfulness of continuing the suspension and the reasonableness of the delays were neither arbitrary, capricious, nor contrary to law.

### Conclusion

Engdahl was properly suspended without pay by the government under the Act. Moreover, no procedural or substantive due process right was violated in relation to that adverse action. Last, Engdahl's suspension was properly continued until his removal on June 17, 1988. Accordingly, the Board's decision is

AFFIRMED.

DUFF, District Judge, concurring in the result.

I agree with the court that the Department of the Navy lawfully suspended Otto Engdahl under Chapter 75 of the Civil Service Reform Act of 1978, codified at 5 U.S.C. §§ 7501 et seq. (1988), and that the Navy did not violate Engdahl's right to due process under the fifth amendment to the Constitution. I write separately only to express caution at one aspect of the court's opinion, and to register a minor disagreement.

The central issue concerning the Navy's power to suspend Engdahl under Chapter 75 is whether the Navy's suspension was "disciplinary," as that word appears in 5 U.S.C. § 7501(2). The court has discussed § 7501(2)'s use of "disciplinary" four times prior to this case, beginning with *Thomas v. General Services Admin.*, 756 F.2d 86 (Fed.Cir.1985). In *Thomas*, the General Services Administration suspended an employee whom a psychiatrist had diagnosed as highly paranoid, pending action on the agency's application to retire the employee on grounds of disability. The employee trained federal law enforcement officers, had disrupted agency operations on numerous occasions, and had threatened his co-workers. See *id.* at 87.

The agency claimed that it could suspend the employee under Chapter 75 as a disciplinary measure. This court agreed. While the court's decision today quotes from the pertinent passage in *Thomas* which justified the agency's action as being disciplinary, I believe that the context of those quotations is so critical to their meaning that I must quote a fuller version here:

> We conclude that Congress did not intend, in the [Civil Service] Reform Act, to preclude appeals [to the Merit Systems Protection Board] of involuntary suspensions [in disability retirement cases]. Such suspensions—which are ordered because the agency believes that the employee's retention on active duty could result in damage to federal property, or be detrimental to governmental interests, or be injurious to the employee, his fellow workers, or the public—are "disciplinary" in the broader sense of maintaining the orderly working of the Government against possible disruption by the suspended employee (pending the determination of that employee's disability retirement).

*Thomas*, 756 F.2d at 89 (footnote omitted).

*Thomas* defined "discipline" for purposes of Chapter 75 as a means to achieve

---

5. Although Engdahl correctly notes that the government's investigation as to whether he actually committed a crime was effectively complete once he entered his pleas, the government must also always investigate whether there is a sufficient nexus between the crimes committed and the efficiency of the service to warrant removal. Investigation into this question is not completely resolved until the employee has had his right to reply.

specific ends—namely, protecting government property, preserving the orderly working of the government, and saving the employee, his co-workers, and the public from injury. Discipline is not an end in itself, nor is it a means by which the government may serve private interests. Every decision of this court which has invoked *Thomas*'s definition comports with this view. *See Mercer v. Dept. of Health & Human Services*, 772 F.2d 856 (Fed.Cir. 1985) (upholding suspension of employee who slept on job and threatened co-workers with injury); *Wilson v. Turnage*, 791 F.2d 151 (Fed.Cir.1986) (upholding suspension of Selective Service employee who took concerns about military preparedness outside of the chain of command); *Pittman v. Merit Systems Protection Bd.*, 832 F.2d 598 (Fed.Cir.1987) (upholding suspension of employee who was physically incapable of performing light work; suspension protected worker from injury and served government's interest in seeing work performed properly).

*Thomas*'s definition of "disciplinary" allowed the Navy to suspend Engdahl without pay under Chapter 75 of the Act. As the court observes, Engdahl's superiors lost confidence in Engdahl's ability to perform his work safely, as his duties required him to enter private households on the naval base where Engdahl worked. One finds the evidence which indicates that Engdahl was a risk to base personnel in affidavits from Engdahl's supervisors. From the record it appears that Engdahl never challenged the opinions reflected in these affidavits. Had Engdahl done so,

this appeal could have turned out differently. *See D.E. v. Department of the Navy, MSPB*, 721 F.2d 1165, 1169 (9th Cir.1983) (Navy employee convicted of child molestation; Navy's conclusory claims of distrust of employee insufficient to support subsequent discharge of employee). Nevertheless, the Navy had a legitimate disciplinary interest under *Thomas* in suspending Engdahl, rather than risking injury to persons living in base households or incurring costs to supervise Engdahl more closely.

The court also points out that the Navy had a second reason for disciplining Engdahl: improving the job performance of Engdahl's female co-workers. The record again supports the Navy's contention that Engdahl's presence at the base prevented at least two of its employees from working well; again the Navy prevails perhaps on account of less than strenuous opposition from Engdahl.[*] But here is where I feel caution is required. Although the presumption in our criminal laws is that a person is innocent until proven guilty, our emotional presumptions often run the opposite—and it is the rare person who does not bring his or her emotions to the workplace. One could read the court's opinion as approving government efforts to cater to these emotions, under the guise of promoting workplace efficiency.

There are dangers in this. It is perhaps easy for one to approve of suspending a worker accused of the heinous crimes which Engdahl faced—notwithstanding what appears to be an unsullied work record, and no evidence of any sexual devi-

---

[*] The Administrative Judge presented the most complete description of these two affidavits in the record:

> In her affidavit, Kathleen T. Quinn noted that she is a supply clerk ... [who] comes into contact with [Engdahl] probably a couple of times a week. Quinn first learned of [Engdahl's] arrest when she was shown a newspaper article reporting the incident by a co-worker. She is aware that some of the charges were dropped at [Engdahl's preliminary] hearing, but would feel uncomfortable and extremely uneasy if she would come in contact with [Engdahl]. She characterized her feelings as being disgust and revulsion, and would not want to work around him anymore.

> In her affidavit, Carmen I. Castro stated that she is a clerk-typist ... and first became aware of [Engdahl's] arrest when she was shown a newspaper article ... by Ms. Quinn. She works in the office with Quinn, and regularly sees [Engdahl] at least twice a week in the office, and almost every day on the agency premises outside of the office. She is aware that certain of the charges against [Engdahl] were dropped, but still feels strongly that she would be very uncomfortable if she ever came in contact with him again. Castro is fearful of her well being in that she might sometimes be alone in the office when [Engdahl] would be about the agency premises.

Petitioner's Appendix 21–22.

ance outside of the home. Nevertheless, I fear the cases which are further down the slope which the court may be on today. What of the employee who is arrested in an unpopular protest, one which makes the employee's co-workers feel "uncomfortable," "disgusted," or "revulsed?" I would hope that this court would stop short of countenancing a disciplinary suspension in such a situation, but by enshrining workplace efficiency in the manner the court chooses today, the court might be ready to accept even that result.

I can briefly state my one disagreement with the court. The court states that the public had three interests which outweighed Engdahl's significant stake in keeping his job: protecting base residents, assuring workplace efficiency, and avoiding adverse publicity to the Navy. Subject to the concerns which I have expressed already, I agree with the court that the public had an interest in protecting base residents and assuring workplace efficiency. I disagree that the government had an interest in avoiding notoriety in this case. While it is true that the press reported the initial charges against Engdahl, nothing in the record supports the conclusions that this press reflected badly on the Navy, and that the public had less confidence in naval operations as a result of Engdahl's arrest.

But this is a minor point. The court reaches the correct conclusion that, in light of the interests at stake and the alternative procedures available to the Navy, Engdahl has not demonstrated that the Navy deprived him of due process. Engdahl had ample opportunities to persuade the Navy that its concerns were unfounded, and I cannot fault the Navy for Engdahl's choice not to challenge the allegations of his fellow workers. It was thus lawful for the Navy to suspend Engdahl, even if the accusations of Engdahl's co-workers were in large part what I suspect them to be: the products of visceral reactions to Engdahl's arrest.