**Susan STROUSS, Plaintiff,**

v.

**MICHIGAN DEPARTMENT OF CORRECTIONS, a state agency, and Marie Fletcher, and Gerald DeVoss, in their individual capacities, Defendants.**

No. 98–CV–72658–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 29, 1999.

Christine A. Green, Ann Arbor, MI, for plaintiff.

Marie Shamraj, Dept. of Atty. General, Lansing, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Title VII/Section 1983 due process and equal protection action is presently before the Court on Defendants' Motion to Dismiss and/or for Summary Judgment.

Plaintiff has responded to Defendants' Motion. The Court has reviewed and considered the parties' respective briefs and supporting documents and has determined that oral argument on this matter is not necessary. Therefore, as counsel for the parties were advised, pursuant to Local Rule 7.1(e)(2), the Court will decide this matter on the briefs. This Opinion and Order sets forth the Court's ruling. .

## II. *PERTINENT FACTS*

Plaintiff Susan Strouss, a 40–year–old white female, is a former Michigan Department of Corrections nurse. Ms. Strouss began working for the MDOC in 1992 as a staff nurse on the 3–East Unit of Duane Waters Hospital on the premises of the State Prison of Southern Michigan in Jackson. She was subsequently promoted to an RN12 Nurse–Manager position. While working on 3–East, Plaintiff worked the first shift (5:30 a.m.–2:30 p.m.)

In late 1993, one of Plaintiff's subordinates, Teresa Walters, complained to her of sexual harassment by Wardell Brown, who was Plaintiff's immediate superior. Plaintiff claims she took Walters' complaint to Nancy Duckworth, the Assistant Director of Nursing, who, in turn, allegedly took the complaint to Defendant Marie Fletcher, the Director of Nursing. Strouss claims that Duckworth and Fletcher promised to take care of the matter, but nothing ever happened. Instead, Plaintiff claims that after complaining of Brown's sexual harassment, Brown began to accuse her with not doing her work. Eventually, in April 1994, Plaintiff was transferred out

of Brown's 3–East Unit to the 3–West (Chronic Care) Unit [1] where she remained until July 1997. During this entire time period, Plaintiff worked the first shift, i.e., the same shift she worked while on 3–East.

During her three-year tenure in the Chronic Care Unit, it appears that there were a number of patient complaints concerning Plaintiff's care. Although Defendant Fletcher testified that she never criticized Plaintiff in a performance evaluation in connection with any of the prisoner-patient complaints she admitted that she took the complaints into consideration in deciding to reassign Plaintiff in July 1997, after disciplinary charges for failing to abide by work rules were brought against her.

On June 4, 1997, Plaintiff was charged with violation of several Department Work Rules.[2] The charges rose out of two incidents—one for violating a directive that she was to take another nurse with her into the room whenever administering to one particular prisoner. The other was for failing to call an eye specialist regarding a pre-surgical medication that was to be administered to another prisoner. Plaintiff was notified of the charges against her by Defendants Gerald DeVoss and Marie Fletcher and was suspended without pay as of June 5, 1997, pending an investigation into the charges. The suspension-pending-investigation lasted five days, through June 11, 1997, [see Defendants' Ex. B], during which time Inspector Brad Balance and Nurse Nancy Duckworth con-

---

1. Plaintiff filed two EEOC charges in March 1994 and August 1994 relating to her complaints in January – March 1994 about Brown's harassment and her subsequent transfer to 3–West in April 1994. In those EEOC charges, Strouss alleged that she was "harassed because of her race and in retaliation for having been a witness in the investigation of the sex harassment charge" (3/18/94 EEOC charge) and "subjected to continuous harassment and different terms, conditions and privileges of employment in retaliation for filing a previous charge of discrimination....." (8/8/94 EEOC charge). Plaintiff specifically marked this latter August 1994

charge as a "continuing action." [See Defendants' Ex. K.] As discussed *infra*, Plaintiff attempts to incorporate her allegations concerning her treatment on 3–East in 1994 and her transfer to 3–West into this action.

2. Specifically, Plaintiff was charged with violation of: Work Rule # 1 (Humane Treatment of Prisoners); Work Rule # 9 (Insubordination Class I); Work Rule # 13 (Failure to Follow Policies and Procedures); Work Rule # 27 (Dereliction of Duty); and Work Rule # 38 (Failure to meet reporting requirements).

ducted an investigation. Plaintiff Strouss refused to participate in the investigation.[3] The investigators submitted their reports on June 13 and July 1. [See Plaintiffs' Ex. 7 and 8.]

A Disciplinary Conference was convened by Defendant DeVoss on August 19, 1997 at which conference Nancy Duckworth, Plaintiff Susan Strouss, and her AFSCME representative, Marsha Kelly, were present. R. Cole Bouck, Regional Administrative Assistant, presided as hearing officer. At this Disciplinary Conference, Mr. Bouck focused only on the two specific incidents discussed above—i.e., entering a patient's room alone and the physician's order for eyedrops. Plaintiff was given an opportunity to present her side of the story as to both of these incidents. [See Defendants' Ex. B; Plaintiff's Ex. 6].[4] After the Disciplinary Conference, Plaintiff was found guilty of the Rules violations alleged and given a five-day unpaid suspension. She was credited for the time she was suspended pending the investigation and, therefore, was not further disciplined for these incidents. [See Defendants' Ex. B.] Plaintiff alleges that she grieved the disciplinary action taken against her through the Civil Service to the third step. [Complaint, ¶ 83.] She claims, however, that the departmental investigator refused to take the matter on to the adjudicatory level, *id*, and she did nothing further to pursue the matter.

Meanwhile, while the investigation into the charges of rules violations was still in progress, on July 9, 1997, Plaintiff was informed that she was being transferred to the Central Complex facility, effective July 14, 1997, due to operational needs. Although not entailing any change in salary or status, this transfer was to the second shift (2:00 p.m.–10:30 p.m.). Strouss complained that the change to the second shift would conflict with her taking classes that she needed to complete her degree at Ferris State University. She further complained that there were prisoners housed in the Central Complex who had made threats against her. Plaintiff took her complaints to Jacklyn Jackson, Regional Director of Nursing for Outpatient Care (also known as "Ambulatory Care"). In response to Plaintiff's concerns, Ms. Jackson placed Strouss on the day shift as a staff nurse in Ambulatory Care at the Joseph Cotton Facility without any decrease in her pay.

Jacklyn Jackson stated in her deposition and her subsequent Affidavit that Plaintiff was told at the time of her assignment to the Joseph Cotton Facility that that assignment was only temporary; that they were in the process of interviewing for permanent day shift positions. She encouraged Plaintiff to interview for these positions because once they were filled, Plaintiff would have to return to her RN12 Manager position in Central Complex.[5] Plaintiff counters that she was told by Ms. Jackson that her transfer to the day shift in Ambulatory Care was to be permanent; that she did not have to interview for the positions, but rather, only had to give Ms. Jackson her social security number so her name could be placed on the "register" for the open positions. This, Plaintiff said, she did.

---

**3.** Investigative questions were sent to Plaintiff via standard and certified mail. She signed the certified mail receipt but failed to return any responses to the questions. [See Plaintiff's Ex. 8.]

**4.** Plaintiff attempts to make out an allegation in her brief that she was not permitted to respond to the charges at this hearing. However, the deposition testimony of Plaintiff and her witness establishes that Plaintiff *was* afforded an opportunity to explain herself. She was not, however, permitted to bring up numerous other *unrelated* complaints she had concerning her supervisors and was not permitted to present her claims that Nancy Duckworth, who conducted the investigation, and Dr. Barth, the doctor whose orders regarding eyedrops she allegedly violated, were biased against her.

**5.** Ms. Jackson's version of what she told Plaintiff is corroborated by Nancy Lange who was Plaintiff's immediate supervisor while at the Cotton Ambulatory Care Facility. [See Defendant's Ex. F.]

With respect to Plaintiff's concern about placement in Central Complex because of threats allegedly made by prisoners who were housed there, Jacklyn Jackson testified that she told Plaintiff to give her the names and prisoner numbers of these alleged prisoner enemies, but Plaintiff never did so. Plaintiff disputes this. Although not disputing that she never gave Ms. Jackson prisoner numbers and that she never provided the prisoners' names *in writing,* she claims that she did at least verbally tell Ms. Jackson who the prisoners were who had made threats against her.

Plaintiff worked in Ambulatory Care at the Cotton Facility apparently without incident for the next few months. Then, on October 2, 1997, Plaintiff told her immediate supervisor, Nancy Lange, about some inappropriate comments (about her "butt") made by one of the contract doctors, Dr. Donovan Givens, who worked there. Plaintiff, however, did not want to file a formal complaint of sexual harassment against Dr. Givens. Nonetheless, Nancy Lange reported the incident to the sexual harassment counselor at the facility, and also informed Dr. Gregory Naylor, Dr. Givens' supervisor, and Gerald DeVoss, the Regional Health Care Administrator, about the matter. A few days later, Dr. Givens was transferred out of Ambulatory Care.

On October 20, 1997, Plaintiff was informed by Jacklyn Jackson that she was being transferred back to the Central Complex Facility to work the second shift as originally scheduled. Ms. Jackson's October 20 Memorandum to Plaintiff stated:

Effective November 3, 1997, it will be necessary for you to report to SMI/JMF on the afternoon shift 2:00 p.m. to 10:30 p.m.

You have expressed to me that you have concerns regarding certain "prisoners" locking in this area. If this is still so, you must supply me with the names and numbers by October 23, 1997.

As mutually discussed and agreed upon, you were temporarily assigned to JCF on the day shift to allow you the opportunity to orient to ambulatory care and to interview for anticipated 6:00 a.m. to 2:30 p.m. positions here in Jackson. These positions have been filled and the JCF staff is up to complement.

[Plaintiff's Ex. 10.]

Plaintiff claims that on October 21, 1997 she again gave Jacklyn Jackson the names of the prisoners housed in Central Complex who had threatened her and that Jackson said she would "see what she could do about it." [Plaintiff's Dep. p. 164.] Plaintiff testified in her deposition that, "[t]hat just wasn't good enough for me, and I told her I would have to give her my resignation." *Id.* Strouss had two weeks of sick leave time so she took the next two weeks off and on November 4, 1997, quit her job. *Id.* at 165–66.

On November 20, 1997, Plaintiff filed an EEOC complaint charging the Michigan Department of Corrections with retaliation. Unlike her previous August 1994 charge, Plaintiff did not indicate that this was a "continuing action," but rather indicated only that the date on which the alleged wrongful retaliation took place was "10/20/97," i.e., the date on which Plaintiff was notified that she was being transferred from the Joseph Cotton Ambulatory Care Facility to the second shift in the Central Complex. [See Defendants' Ex. H.] In her charge Plaintiff stated as follows:

I began employment with the above named respondent as a Nurse in April of 1992. A year later, I was promoted to the position of Nurse Manager.

On October 2, 1997, I was subjected to unwelcome sexual comments about [my] butt by the doctor whom with I was working. This occurred over a two day period of time. I spoke with my supervisor about the problem. I was told to take someone with me and to tell the doctor that I didn't appreciate the remarks that he was making. I did this and no more comments were made. A couple of days later he was gone.

The next day my supervisor gave me a package which outlined the procedures for filing a sexual harassment complaint. On October 20, 1997, I was told that I was going to [be] transferred to Central complex allegedly because they needed a Nurse Manager in the area. I had received death threats from two inmates. I was forced to resigned [sic].

I believe that I was transferred in retaliation for complaining about sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Defendants' Ex. H.]

The EEOC investigated the matter and on March 20, 1998, notified Plaintiff that it had determined that the information obtained during its investigation "does not support a conclusion that the statute(s) complained of has/have been violated." [See Defendants' Ex. I.] The letter specifically advised Plaintiff that "[t]here is no evidence to establish that you have been transferred in retaliation for complaining about alleged sexual harassment," and that the MDOC "has articulated legitimate nondiscriminatory reasons for its actions." *Id.* On March 26, 1998, the EEOC issued its Notification of Right to Sue, notifying Plaintiff that she had 90 days from receipt thereof to institute a judicial action. [Defendants' Ex. J.] Plaintiff states in her Complaint that she received the Right to Sue notice on March 28, 1998. See Plaintiff's Complaint, ¶ 18.

On June 24, 1998, exactly 90 days after she received the Right to Sue letter, Plaintiff initiated the instant action against the MDOC, and individual Defendants Marie Fletcher and Gerald DeVoss.

### III. *PLAINTIFF'S COMPLAINT ALLEGATIONS*

In Count I of her two-count Complaint, captioned "Violation of Title VII by Department of Corrections and Individual Defendants—Retaliation for Opposing Unlawful Employment Practices," Plaintiff alleges that the Defendants began a course of retaliating against her in 1994 "because

she opposed and complained of sexual harassment by Wardell Brown" and that that course of conduct "continued throughout Plaintiff's years of employment with the Defendant Department of Corrections, and continued until the date Plaintiff was forced to resign...." Complaint, ¶¶ 35–36. She further states that the proposed transfer of her in the Fall of 1997 to the Central Complex second shift was also "in retaliation for Plaintiff having complained of sexual harassment by Wardell Brown [in 1994]" and in retaliation for having complained of "offensive sexual comments about her butt" by "a physician at the Cotton Facility" [i.e., Dr. Givens]. *Id.* ¶¶ 53, 60–72.

In Count II of her Complaint, "Violation of 42 U.S.C.1983—Denial of Due Process and Equal Protection Against the Individual Defendants," Plaintiff alleges that she was "wrongfully accused of not following through with doctor's orders regarding a prisoner's impending surgery and of entering a patient's room alone" and "unfairly disciplined in June of 1997 in retaliation for having complained of sexual harassment of Wardell Brown, in violation of her rights to due process and equal protection of the laws protected by the Fifth and Fourteenth Amendments to the United States Constitution." Complaint, ¶ 79–80. Specifically, Plaintiff complains that Defendants Fletcher and DeVoss committed the following due process violations in connection with disciplining and suspending her in June 1997:

1. The charges were based upon the statement of an inmate, in violation of Department Policy;

2. Plaintiff was not given previous notification in writing of the claimed violation and the disciplinary penalty or possible penalty;

3. Plaintiff was not provided the benefit of a disciplinary conference prior to her suspension-pending-investigation;

4. Plaintiff was not timely given information relating to the charges, limit-

ing her opportunity to collect information relating to the charges;

5. Nancy Duckworth, an individual who Plaintiff claims has a personal bias against her because she complained of sexual harassment, conducted the investigation; and

6. Plaintiff was not permitted to raise at the disciplinary conference her claims of bias on the part of Ms. Duckworth and Dr. Barth, the doctor whose instructions regarding eyedrops she was charged with disobeying.

Complaint, ¶ 82.

As for Plaintiff's "equal protection" claim, Plaintiff alleges that Defendants Fletcher and DeVoss instituted disciplinary proceedings against her in June 1997 and attempted to transfer her to the second shift in Central Complex in retaliation for her having complained of sexual harassment. This, she contends, amounts to subjecting her to different standards of treatment from that afforded "other departmental employees who did not complain of sexual harassment." *Id.* ¶¶ 86–89.

Discovery has now closed in this matter and Defendants have moved for summary judgment.

## IV. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348,

89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

■ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish

---

**6.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp).

that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply these standards in deciding Defendants' Motion for Summary Judgment in this case.

### B. *PLAINTIFF CONCEDES THAT HER TITLE VII RETALIATION ˎCLAIM AGAINST INDIVIDUAL DEFENDANTS FLETCHER AND DEVOSS MUST BE DISMISSED*

As an initial matter, as indicated above, in Count I of her Complaint, Plaintiff asserts a Title VII claim of retaliation against both her employer, the Michigan Department of Corrections, and two individual MDOC supervisory/managerial employees, Marie Fletcher, Director of Nursing, and Gerald DeVoss, Regional Health Administrator. However, in her Response Brief, "Plaintiff concedes that there is no individual liability under Title VII under the circumstances of this case." [Plaintiff's Response Brief, p. 12.] [7]

Therefore, Count I of Plaintiff's Complaint will be dismissed in its entirety as to Defendants Fletcher and DeVoss.

---

**7.** In *Wathen v. General Elec. Co.,* 115 F.3d 400 (6th Cir.1997), the Sixth Circuit, after reviewing decisions from a number of other Circuit Courts, expressly held that "an indi-

### C. *PLAINTIFF'S TITLE VII RETALIATION CLAIM IS LIMITED TO THE SCOPE OF HER NOVEMBER ˎ20, 1997 EEOC CHARGE*

It is well-established that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge. *See, Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 254 (6th Cir. 1998); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 544–45 (6th Cir.1991). While it is true that retaliation claims are generally excepted from this filing requirement because they usually arise after the filing of the EEOC charge (and hence, can be reasonable expected to grow out of the charge), this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred *before* the EEOC charge was filed. *Id.* at 546–7.

In this case, Plaintiff filed the EEOC charge which provides this Court with jurisdiction over this matter on November 20, 1997. In that charge, Plaintiff stated as follows:

I began employment with the above named respondent as a Nurse in April of 1992. A year later, I was promoted to the position of Nurse Manager.

On October 2, 1997, I was subjected to unwelcome sexual comments about [my] butt by the doctor whom with I was working. This occurred over a two day period of time. I spoke with my supervisor about the problem. I was told to take someone with me and to tell the doctor that I didn't appreciate the remarks that he was making. I did this and no more comments were made. A couple of days later he was gone.

---

vidual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Id.* at 405.

The next day my supervisor gave me a package which outlined the procedures for filing a sexual harassment complaint. On October 20, 1997, I was told that I was going to [be] transferred to Central complex allegedly because they needed a Nurse Manager in the area. I had received death threats from two inmates. I was forced to resigned [sic].

I believe that I was transferred in retaliation for complaining about sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Defendants' Ex. H.]

Plaintiff's Complaint allegations exceed the scope of the EEOC charge. In Count I of her Complaint, captioned "Violation of Title VII by Department of Corrections and Individual Defendants—Retaliation for Opposing Unlawful Employment Practices," Plaintiff alleges that she has been retaliated against by Defendants because she opposed and complained of sexual harassment by Wardell Brown in 1994, and that that course of conduct "continued throughout Plaintiff's years of employment with the Defendant Department of Corrections, and continued until the date Plaintiff was forced to resign...." Complaint, ¶¶ 35–36. She further states that the proposed transfer of her in the Fall of 1997 to the Central Complex second shift was also "in retaliation for Plaintiff having complained of sexual harassment by Wardell Brown" and in retaliation for having complained of "offensive sexual comments about her butt" by "a physician at the Cotton Facility" [i.e., Dr. Givens]. *Id.* ¶¶ 53, 60–72.

 It cannot be said that Plaintiff's allegations of being retaliated against by her employer for having complained of and opposed sexual harassment by Wardell Brown *in 1994* can reasonably be expected to grow out of the EEOC charge of retaliation for complaining about "unwelcome sexual comments about [her] butt" by a doctor she was working with in 1997. Plaintiff contends that she should be entitled to pursue her action as to all of the

incidents that she complains of from 1994 forward because she claims she told the EEOC investigator about the 1994 events and her previous EEOC charges, and that she believed that the accusations made against her in June 1997, her transfer in July 1997, her disciplinary hearing in August 1997 and her "constructive discharge" in November 1997, all were in retaliation for her involvement with other employees' sexual harassment complaints against Wardell Brown. Since the EEOC investigator, not Plaintiff, prepared the charge form, she claims she should not be limited in this action by what the investigator put in the charge, but rather should be permitted to pursue her claim of "continuing" retaliatory action.

 Not surprisingly, Plaintiff cites no authority whatsoever for any of her arguments. First of all, with respect to Plaintiff's contention that since she did not personally prepare her EEOC charge she should not be limited by what the EEOC investigator stated in it, Plaintiff read and signed the charge. Plaintiff is not an uneducated woman. She is a college-educated, health care professional and, therefore, cannot be heard to complain that she did not know what she was signing. Furthermore, it appears that Plaintiff signed the charge in the presence of the EEOC counselor. If she wanted to include pre–1997 allegations, she clearly had the opportunity to see to it that those allegations were included. Moreover, the charge form has a space for indicating whether or not Plaintiff's complaint is one of a "continuing action". Plaintiff could have checked that box but did not. That Plaintiff knew she could have indicated on her charge that she was complaining of continuing retaliation is evident from the EEOC charges she filed in 1994 concerning her opposition activities in connection with the alleged sexual harassment of her subordinates by Wardell Brown. In her August 8, 1994 charge, Plaintiff checked "continuing action," tying her allegations of retaliation in that charge to her earlier March 18, 1994 race and retaliation charge, and specifically alleged in the text of her charge that she was

being subjected to "continuous" harassment as a result of her opposition activities.[8] But on her 1997 charge, rather than mark that the matter was a "continuing action" to link that charge to her 1994 charges, she indicated in the space provided (directly above the box marked "continuing action") that the earliest date on which the complained of action occurred was "10/20/97" and the latest date on which the complained of action occurred was "10/20/97." [9]

More importantly, Plaintiff is now precluded by the Title VII statute of limitations from litigating her Title VII claims concerning Wardell Brown and her allegations of retaliation stemming from what occurred in 1994. 42 U.S.C. § 2000e–5(f)(1) provides, in pertinent part, as follows:

> If a charge filed with the Commission ... is dismissed ..., or if within one

hundred and eighty days from the filing of such charge ... the Commission [or the State Attorney General] has not filed a civil action under this section ...., within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved....

Plaintiff, thus, had, at most, 270 days from the date of filing her August 8, 1994 charge (i.e., until May 6, 1995) to prosecute her Title VII claims of retaliation concerning her 1994 activities. Plaintiff did not file her Complaint in this action until June 24, 1999 more than three years after the statute of limitations had run. She, therefore, is time-barred from litigating these matters now through an EEOC charge that makes no mention whatsoever of the 1994 activities and fails to indicate any-

---

8. Plaintiff alleged the following in her March 18, 1994 race discrimination/retaliation charge:

> I was hired April 12, 1992 as an RN II, and in April 1993 I was promoted to RN II S. In January 1994 I assisted an investigation being done by the Department into alleged sexual harassment of a co-worker, by my supervisor. Since then my supervisor has harassed me *continually*. On March 9, 1994, I filed a harassment charge with the Department, but *the harassment has continued*.
> I am a White female and I believe I have been harassed because of my race and in retaliation for having been a witness in the investigation of the sex harassment charge, in violation of Title VII of the Civil Rights Act of 1964, as amended.

In her August 8, 1994 retaliation charge, marked as a "continuing action" Plaintiff alleged:

> I began my employment with the above-named employer on April 12, 1992. I am currently employed as a Registered Nurse II. On or about March 31, 1994, I filed Charge No.: 230–94–1133 with the EEOC. Since my employer received notice of this charge, *I have been subjected to continuous harassment* in the form of threats, criticism of my work and close scrutiny of my work. Further, effective April 26, 1994, I was transferred into another unit.
> I believe that I have been subjected to *continuous* harassment and different terms, conditions and privileges of employment in

retaliation for filing a previous charge of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended. [See Defendants' Ex. K (emphasis added).]

Plaintiff testified in her deposition that the EEOC conducted an investigation, found her charges unsubstantiated and dismissed the complaints. [See Plaintiff's Dep. pp. 46–47, 134–135.]

9. Marking "continuing action" is not required to establish a claim of continuing violation so long as "allegations or predicate facts [are] sufficient in the EEO complaint" to establish that a continuing violation theory is being alleged. *Haithcock v. Frank*, 958 F.2d 671, 676 (6th Cir.1992). Thus, for example, a plaintiff's allegation in his EEOC charge that his employer "engaged in a pattern and practice of retaliating against him" has been held sufficient evidence of a continuing violation theory to entitle the plaintiff to pursue such a claim in federal court. *See Sosa v. Hiraoka*, 920 F.2d 1451, 1457 (9th Cir.1990) (quoted with approval by the Sixth Circuit in *Haithcock, supra*.) No such language is present in Plaintiff's 1997 charge. By contrast, compare Plaintiff's allegations in her 1994 EEOC charges in which she alleged that her supervisor "harassed [her] *continually*" and subjected her to "*continuous* harassment" in retaliation for her opposition activities. *See* note 8, *supra*.

where therein that Plaintiff is alleging a continuing violation of the statute.

As for Plaintiff's allegations in this action of "untrue accusations" made against her in June 1997, the July 9, 1997 decision to transfer her to Central Complex, and her disciplinary hearing in August 19, 1997, these matters are not mentioned at all in Plaintiff's November 1997 EEOC charge. Clearly, they cannot fairly be said to arise from her charge because they occurred two months before Plaintiff's October 2, 1997 complaint about unwelcomed sexual comments made by Dr. Givens.[10] As the Eighth Circuit succinctly stated in *Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681 (8th Cir.1998), *cert. denied*, — U.S. —, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999),

> Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.

*Id.* at 688 (citation omitted).

For all of the foregoing reasons, the Court determines that Defendants should be granted partial summary judgment as to Plaintiff's Title VII claim in Count I of her Complaint, and Plaintiff's allegations of retaliation that pre-date October 2, 1997 will be dismissed.

## D. PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION

With respect to Plaintiff's only administratively exhausted claim, i.e., her claim of being retaliated against for complaining to her supervisor of sexual harassment by Dr. Givens on October 2, 1997, the Court finds that Plaintiff has failed to establish a *prima facie* case. In order to state a claim of retaliation under the federal civil rights laws, a plaintiff must establish by a preponderance of the evidence:

1. That she engaged in a protected activity;
2. That the defendant knew of this exercise of her protected rights;
3. That the defendant consequently took an employment action adverse to plaintiff; and
4. That there was a causal connection between the protected activity and the adverse employment action.

*Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831–2 (6th Cir.1999); *Moore v. KUKA Welding Systems*, 171 F.3d 1073, 1079 (6th Cir. 1999); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (1997); *Canitia v. Yellow Freight System*, 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). All four elements must be established in order to make out a *prima facie* case. *Fenton, supra*, 174 F.3d at 832.

Both federal law and Michigan law prohibit retaliatory conduct by an employer in two situations: (1) when an employee has made a charge of discrimination or filed a complaint of discrimination with the EEOC or the Michigan Department of Civil Rights or otherwise participated in enforcement proceedings before one of those agencies ("the participation clause"); or (2) when an employee "has opposed a violation [of the Act ]" (the "opposition

---

**10.** To the extent that Plaintiff attempts to assert that the June–August 1997 actions were taken in retaliation for her 1994 opposition activities, Plaintiff has failed to exhaust her administrative remedies. The filing of a timely EEOC charge is a prerequisite to instituting a judicial Title VII action. *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 620 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). Plaintiff clearly could have filed a charge of discrimi-

nation alleging that these June–August 1997 actions were taken in retaliation for her 1994 retaliation activities. She, in fact, had 300 days from the date of the alleged discriminatory practice to do so. *Id.* at 622; 42 U.S.C. § 2000e–5(e)(1). Using the date of the latest of the June–August actions, i.e., August 19, 1997 (the date of Plaintiff's disciplinary hearing), Plaintiff had until June 16, 1998 to file an EEOC charge. She failed to do so and now her claims are time-barred.

clause"). *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). As the Sixth Circuit observed in *Booker*, "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Id.* The "exceptionally broad protection" of the participation clause extends to persons who have "participated in any manner" in proceedings under the federal civil rights laws. *Id.* On the other hand, "the opposition clause" does not protect all "opposition" activity. In opposition cases, courts are required "to balance the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* (citations omitted).

Plaintiff's retaliation claim here is that she was retaliated against for engaging in "opposition" activities—complaining to her supervisor of sexual harassment by Dr. Givens in October 1997. Therefore, her claims will be evaluated under the above-quoted standard.

Defendants do not contest Plaintiff's satisfaction of the first two elements—Plaintiff engaged in a protected activity and her employer knew about her actions. They do, however, dispute her satisfaction of the third and fourth elements.

■ Defendants argue that Plaintiff failed to establish the third element—i.e., that she was subjected to an adverse employment action. Although Defendants do not dispute that Plaintiff's transfer to Central Complex would entail a shift change, they argue that because the Central Complex position was merely a "lateral" transfer that did not entail any change in Plaintiff's salary or position, Plaintiff has not established a legally cognizable adverse employment action.

In *Hollins v. Atlantic Company*, 188 F.3d 652 (6th Cir.1999), the Sixth Circuit held that in Title VII retaliation action, in order to satisfy the required "adverse employment action" element, the plaintiff must establish *"[A] materially adverse change in the terms and conditions of [his] employment"* *Id.* at 662. To determine what constitutes a "materially adverse change in terms and conditions of employment," the *Hollins* court adopted into this Circuit's Title VII jurisprudence the factors set forth by the Seventh Circuit in *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993), and previously applied in *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996). Noting that although *Crady* arose under the Age Discrimination in Employment Act, and *Kocsis* addressed the Americans with Disabilities Act, the *Hollins* court determined that the factors considered in those cases should also be applied in determining whether a plaintiff has stated a claim for retaliation under Title VII. Thus, the *Hollins* court held that:

> a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of responsibilities. A materially adverse change might be indicated by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

188 F.3d at 662 (citations omitted).

As indicated above, Defendants here rely heavily on the fact that Plaintiff's transfer to Central Complex would not cause her to suffer any decrease in wages or benefits. They ignore, however, the fact that the transfer did entail a change in work hours, which impacted upon Plaintiff's ability to continue her education. In finding no materially adverse change in *Kocsis*, the Court of Appeals noted that in that case, the plaintiff's transfer did not entail any work hour changes and, furthermore, was only a temporary transfer. 97

F.3d at 885–6. *See also, Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987). In *Yates,* the court found no adverse employment action in the defendant-employer's decision to transfer the plaintiff to another position where that transfer was only temporary. In reaching that conclusion, the court found persuasive the reasoning of the court in *Ferguson v. E.I. duPont de Nemours and Co.*, 560 F.Supp. 1172, 1201 (D.Del.1983). There, the court found no adverse employment action where the plaintiff's transfer was temporary and resulted in no pay or benefits reduction. However, the *Ferguson* court noted that if the plaintiff's transfer were permanent, it would decide the matter differently. *Id.*

Unlike the plaintiffs in *Kocsis, Yates,* and *Ferguson,* Plaintiff's transfer to Central Complex was to be permanent. Further, it entailed a change in work hours which would materially impact on Plaintiff's ability to continue her education. Under these circumstances, the Court finds sufficient indicia of an adverse employment action so as to satisfy the third requisite element of a Title VII retaliation claim.

▇▇▇ The fourth element of a *prima facie* claim—whether Plaintiff has established a causal connection between her complaining to her supervisor of sexual harassment and her employer's decision to transfer her—is a different issue.

▇▇▇ In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not engaged in a protected activity. *See, Allen v. Michigan Dept. of Corrections,* 165 F.3d 405, 413 (6th Cir.1999). *See also Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127 (6th Cir.1990) (to establish a causal connection, the plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Id.* at 1135 (citations omitted)). Although no one factor is dispositive in establishing a causal connection, evidence that the de-

fendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Moore v. KUKA Welding Systems, supra; Allen v. MDOC, supra; Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987). However, temporal proximity alone will not support an inference of a causal connection in the face of compelling evidence that the defendant employer encouraged complaints about the relevant grievance. *Fenton v. HiSAN, Inc.,* 174 F.3d 827, 832 (6th Cir.1999).

In *Fenton,* the plaintiff claimed that the company retaliated against her for complaining about unwelcome sexual comments made to her by a co-worker, Charles Brown, by transferring her to the "B" shift and by refusing to allow her to schedule her overtime hours at the beginning of her shift in order to accommodate the only arrangement she was able to make with her babysitter. The company's transfer decision was made within three weeks after Fenton complained about Brown's comments.

HISAN had established an explicit sexual harassment policy and provided all employees, including Fenton with a company manual that set forth that policy. The manual provided, in pertinent part,

> Employees who feel that they have been subjected to sexual harassment should immediately bring such matters to the attention of their Supervisor, or the Employee Relations Manager. Reports of this nature will be examined confidentially and impartially, and resolved promptly.

*Id.* at 833.

In accordance with HiSAN's policies, Plaintiff Fenton reported Brown's comments to Barb Rice, her supervisor. Rice testified that plaintiff did not wish to take formal action at that time; rather, she simply wanted Rice to tell Brown to leave her alone. Rice, however, immediately took the matter to her supervisor, the

Plant Superintendent. Turner then reported the complaints to the Human Resources Manager, who on the following day met formally with Fenton to discuss her concerns about Brown's behavior. Human Resources then conducted an internal investigation and spoke with a number of individuals to corroborate plaintiffs accounts of Brown's comments. Five days later, Brown was transferred out of Brown's work station and was advised that any future inappropriate behavior would require disciplinary action against him.

The Sixth Circuit found that this series of events constituted "compelling evidence" that the defendant company encouraged complaints about the relevant grievance. *Id.* Therefore, the court held that any inference of a causal connection arising from the proximity of Plaintiff's complaint to her transfer was negated, and since she offered no other competent evidence to establish a causal nexus, the court found that Plaintiff did not carry her burden of proving the fourth *prima facie* element of retaliation. *Id.*

The facts of this case are virtually identical to the facts in *Fenton.* Like the plaintiff in *Fenton*, Plaintiff in this case relies upon the temporal proximity of her complaints about Dr. Givens to her transfer to establish the requisite causal connection. On October 2, 1997, Plaintiff told her immediate supervisor, Nancy Lange, about some inappropriate comments about her "butt" made by Dr. Givens, a contract doctor who worked with Plaintiff in the Ambulatory Care department. Ms. Lange gave Plaintiff a package outlining the procedures for filing sexual harassment complaints. Plaintiff, however, told Lange that she did not want to file a formal complaint of sexual harassment against Dr. Givens. Even though Plaintiff did not want to file a formal complaint, Lange reported the incident to the sexual harassment counselor at the facility, and also informed Dr. Gregory Naylor, Dr. Givens' supervisor, and Gerald DeVoss, the Regional Health Care Administrator, about the matter. A few days later, Dr. Givens was transferred out of Plaintiff's department.

As the Sixth Circuit found in *Fenton,* the foregoing facts provide "compelling evidence" that Plaintiff's employer encouraged complaints about sexual harassment. Under these circumstances, and by application of *Fenton,* the Court determines that the mere fact that Plaintiff was told she was being transferred two weeks after she had complained of sexual harassment by Dr. Givens is insufficient to establish the requisite causal link to sustain a retaliation claim.

That Plaintiff has not established a causal nexus is further established by the testimony and affidavits of Jacklyn Jackson and Marie Fletcher who both testified that the decision to transfer Plaintiff to Central Complex was made in July 1997, i.e., three months before Plaintiff complained to Nancy Lange about Dr. Givens sexual comments. Indeed, Plaintiff acknowledges that fact in her Response Brief. *See* Plaintiff's Response Brief, p. 13. ("The transfer to SMI [Central Complex] in June [sic; July] of 1997 would have altered Plaintiff's shift from days to afternoons, would have prohibited Plaintiff from finishing her schooling, and would have subjected her to physical danger. *Even though that adverse action was stalled by Jackie Jackson placing Plaintiff at Joseph Cotton Facility [Ambulatory Care], it was eventually acted upon when Jackie Jackson announced to Plaintiff [in October] that she had no choice but to transfer her to SMI **in fulfillment of the original transfer [order]** . . . .*")

Since the decision to transfer Plaintiff actually pre-dates Plaintiff's complaints to her supervisor about Dr. Givens, clearly no causal nexus between those complaints and her transfer to Central Complex.

■ Moreover, even assuming *arguendo* that Plaintiff has made out a *prima facie* claim, Defendants have articulated a legitimate, non-discriminatory reason for her transfer to Central Complex wholly

unrelated to her allegations of retaliation stemming from her complaints about Dr. Givens: Plaintiff was transferred out of Chronic Care due to prisoner-patient complaints about her treatment of them and reassigned to Central Complex where they needed a Nurse Manager. (Her interim staff nurse assignment at the Cotton Ambulatory Care facility was only temporary.) [11]

Defendants having articulated a legitimate, non-discriminatory/non-retaliatory reason for transferring her, the burden shifts to Plaintiff to establish that this articulated reason is but a pretext for the action undertaken by Defendant. *Zanders, supra*, 898 F.2d at 1135.

■ To prove pretext, Plaintiff must show by a preponderance of the evidence either that the proffered reason had no basis in fact, did not actually motivate the employer's action, or was insufficient to motivate the action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). Plaintiff has not met this burden.

Although Plaintiff baldly asserts that prisoner-patient complaints and operational needs were not the true reason for her transfer, she has no evidence to support this assertion.[12] In sum, the Court finds that Plaintiff has not established that her transfer in November 1997 was but a pretext for retaliation.

For all of the foregoing reasons, Defendants' Motion for Summary Judgment will be granted on Plaintiff's retaliation claim in Count I of her Complaint.

**11.** The *McDonnell Douglas/Burdine* burden shifting paradigm applicable in disparate treatment discrimination cases is applicable to retaliation claims, as well. *See, Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1134 (6th Cir.1990).

**12.** Although Plaintiff maintains that the "true reason" for her transfer was MDOC's desire to retaliate against her for complaining about

## E. PLAINTIFF'S SECTION 1983 CLAIMS

In Count II of her Complaint, Plaintiff alleges that she was unfairly disciplined by individual Defendants Fletcher and De-Voss in June 1997 and retaliated against for having complained of sexual harassment by Wardell Brown in violation of her Fifth and Fourteenth Amendment rights to due process and equal protection of the laws.

### 1. Due Process

Plaintiff complains of a violation of due process by Defendants Fletcher and De-Voss in charging her with rules violations and suspending her for five days without pay in June 1997.

■ Preliminarily, the Court notes that it appears that Plaintiff has alleged only a procedural due process claim. However, even if Plaintiff had also alleged a substantive due process claim, that claim would fail as a matter of law because substantive due process protects only fundamental rights created by the Constitution; Plaintiff's right to her job, if any, was created by state contract law, not the Constitution. *See, Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350–51 (6th Cir. 1992) (finding that substantive due process not concerned with "garden variety" contract claims such as those arising from the termination of state employment); *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1223 (6th Cir.1997) ("Clearly, state created employment benefits ... are not 'fundamental' rights created by the Constitution, and therefore, they do not enjoy substantive due process protection." (Ryan, J. concurring)), *cert. denied*, 522

Wardell Brown's sexual harassment in 1994, she has presented no evidence to substantiate that assertion. Furthermore, given the fact that the Wardell Brown incidents occurred more than three years earlier, the lack of a temporal nexus renders this "evidence" of "true reason" of little, if any, value, certainly not enough to amount to a "preponderance of the evidence."

U.S. 861, 118 S.Ct. 164, 139 L.Ed.2d 108 (1997); *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir.1990). *See also, Thornquest v. King*, 82 F.3d 1001, 1003, n. 2 (11th Cir.1996) ("[Plaintiff's] substantive due process claim ... arises from defendant's alleged violation of his state-created non-fundamental property right in his employment. Accordingly, [plaintiff] does not state a cognizable substantive due process claim."); *Myers v. Town of Landis*, 957 F.Supp. 762, 770 (M.D.N.C.1996), *aff'd*, 107 F.3d 867 (4th Cir.1997) ("Substantive due process protects fundamental rights created by the Constitution. [Plaintiff's] right to his job, if any, was created by state contract law, and does not implicate substantive due process.")

Procedural due process claims require a two-part analysis. First, we must determine whether the Plaintiff has identified a protected property right. The constitutional underpinnings of this type of right lie in the Fourteenth Amendment, which safeguards an individual's life, liberty and property from deprivation by the state without due process of law. U.S. CONST. AMEND. XIV, § 1; *see also, Board of*

*Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If it is determined that the Plaintiff's interest was protected by the Fourteenth Amendment, we then must determine whether Plaintiff was afforded an appropriate level of process.

■■■ Plaintiff here alleges a property interest in public employment [13] which she claims was infringed upon when she was suspended for five days without pay, pending an investigation into charges that she violated a number of department work rules. Before discussing the merits of Plaintiff's claim, however, the Court will first address Defendants' qualified immunity argument.

As explained by the Sixth Circuit in *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332 (1990):

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzger-*

---

**13.** To the extent that Plaintiff alleged in her Complaint that she had both a property and a *liberty* interest in her position [Complaint, ¶ 85], Plaintiff cannot make out a claim for deprivation of a constitutionally protected liberty interest. The Supreme Court has defined a liberty interest under the Due Process Clause to include a person's interest in his or her reputation, coupled with the "more tangible benefits or entitlements which rest upon a person's good name." *See Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Accordingly, courts have held that in order to state a claim for the deprivation of a liberty interest, the plaintiff must show (1) a stigmatizing allegation; (2) public disclosure of that allegation; and (3) loss of some tangible interest due to the publication of the stigmatizing allegation. *See, Bank of Jackson County v. Cherry*, 980 F.2d 1354, 1358 (11th Cir.1992), *cert. denied*, 510 U.S. 819, 114 S.Ct. 73, 126 L.Ed.2d 42 (1993); *Sturm v. Clark*, 835 F.2d 1009, 1012 (3rd Cir.1987); *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1179 (1998). Allegations of insubordination, poor work habits, neglect of duties or failure to follow instructions—which is all that the charges of rules violations lodged against

Plaintiff here consist of—are insufficient to make out a deprivation of liberty interest claim. *See, Hicks v. City of Watonga*, 942 F.2d 737, 745 (10th Cir.1991), and cases cited therein. Furthermore, even assuming arguendo that such insubordination/failure to follow instruction allegations can be used to satisfy the first element of a liberty interest due process claim, Plaintiff has not alleged, let alone proven, that these allegations were disseminated by Defendants to any parties other than those involved in the investigation into the charges. *See, Hardiman v. Jefferson County Bd. of Educ.*, 709 F.2d 635, 638 (11th Cir.1983) (without any allegation or proof that the defendant published the charges of immoral conduct on the part of the plaintiff, plaintiff's deprivation of liberty interest claim fails). More importantly, with respect the third element, courts have held that the plaintiff's employment must be terminated in order to satisfy the third element. *See Matthews v. Harney County*, 819 F.2d 889, 891 (9th Cir. 1987). A suspension, even one without pay, will not suffice. *Mustafa v. Clark County School Dist., supra.* Given these strictures, it is clear that Plaintiff cannot make out a deprivation of liberty interest claim.

*ald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Supreme Court has explained that "[t]he contours of the right" alleged "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Moreover, "[t]he relevant inquiry focuses on whether a reasonable official could have believed his conduct to be lawful, considering the state of the law as it existed when the defendant took his challenged actions." *Poe v. Haydon,* 853 F.2d 418, 423–24 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

922 F.2d at 339.

 The question of whether qualified immunity attaches to an official's actions is purely a legal question for the court to decide. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988).

To determine whether a right was "clearly established" for purposes of qualified immunity, the Sixth Circuit has directed lower courts to "look first to decisions of the Supreme Court, then to decisions of [the circuit] court and other courts within our circuit, and finally to decisions of other circuits." *Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564, 579 (6th Cir.1997) (citation and quotation omitted). "[I]t is only in extraordinary circumstances that we can look beyond the Supreme Court and Sixth Circuit precedent to find 'clearly established law.'" *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir.1993). However, there are circumstances when there need not be a relevant decision from the Supreme Court or the Court of Appeals in order to determine that a law is clearly established. As the court observed in *Key v. Grayson,* 179 F.3d 996 (6th Cir.1999), "[T]he decisions of other courts can also clearly establish the law[,] but they must 'point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional.'" *Id.* at 999–1000 (citations omitted). "If reasonable officials could disagree on the issue, immunity should be recognized." *Id.* For qualified immunity to be surrendered, "pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Id.* The burden of convincing a court that the law was clearly established "rests squarely with the plaintiff." *Cope v. Heltsley,* 128 F.3d 452, 459 (6th Cir.1997) (citations omitted).

Plaintiff's due process complaint is that she was not given a hearing prior to being suspended without pay in June 1997 pending the department's investigation into the charges of rules violations lodged against her. Plaintiff bases this claim on her contention that a person with a property interest in public employment must be given a due process hearing prior to being suspended without pay. The Supreme Court, however, has never decided that the protections of the Due Process clause extend to discipline of tenured public employees short of termination. *See Gilbert v. Homar,* 520 U.S. 924, 929, 117 S.Ct. 1807, 1810, 138 L.Ed.2d 120 (1997).

Writing for a unanimous Court in *Gilbert,* Justice Scalia noted:

The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected "property" interest. **Although we have previously held that public employees who can be discharged only for cause have a property interest in their tenure and cannot be *fired* without due process,** *see Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. at 2709–2710, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 602–603, 92 S.Ct. 2694, 2700–2701, 33 L.Ed.2d 570

(1972), **we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination.** Petitioners, however, do not contest this preliminary point, and so without deciding it, we will, like the District Court, "assum[e] that the suspension infringed a protected property interest" and turn at once to petitioners' contention that respondent received all the process he was due. 117 S.Ct. at 1810.

Thus, it is clear that as of the time of Plaintiff's suspension, there was no Supreme Court precedent holding that a suspension of a tenured public employee infringes a protected property interest so as to entitle the employee to the protections of due process. Further, at the time when Plaintiff was suspended, there was no clearly established Sixth Circuit law on this issue, either. *See, Carter v. Western Reserve Psychiatric Habilitation Center,* 767 F.2d 270 (6th Cir.1985), where the Sixth Circuit in a footnote recognized that a suspension without pay might "in theory" constitute a property deprivation, but determined that the plaintiff's two-day suspension without pay in that case was merely a "routine disciplinary suspension" and as such, any deprivation "was *de minimus* and not deserving of due process consideration." 767 F.2d at 272 n. 1.

As for other circuit law, most other circuits that encountered the issue, like the Supreme Court merely have "assumed, without deciding, that a suspension infringes on a protected property interest and thus triggers due process protections." *See, Mustafa v. Clark County School District,* 157 F.3d 1169, 1177 n. 8 (9th Cir. 1998); *Ibarra v. Martin,* 143 F.3d 286, 289 (7th Cir.1998) ("[W]e assume for the sake of argument that suspension is enough to infringe a protected property interest"); *Engdahl v. Dept. of Navy,* 900 F.2d 1572, 1575 (Fed.Cir.1990) ("Assuming, without deciding, that Engdahl had a protected property interest in not being suspended from federal employment without pay, we conclude that the government did afford

him procedural due process"); *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 690 (8th Cir.1998) ("We are unsure whether [by virtue of the CBA] the state intended to create a property interest in avoiding an unpaid suspension. . . . However, we need not decide this issue because even if a property interest was created by the CBA's suspension provision, Wallin received all the process he was due. . . ."), *cert. denied,* —— U.S. ——, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). *See also, Pitts v. Board of Education,* 869 F.2d 555, 556 (10th Cir.1989) (holding that a two-day suspension with pay did not deprive the plaintiff of any measurable property interest but noting that a suspension of a public employee without pay *may* infringe upon a property right.) *But see, Everett v. Napper,* 833 F.2d 1507, 1512 (11th Cir.1987) (holding categorically that a firefighter who was suspended without pay was entitled to the due process protection of a hearing prior to his suspension).

The foregoing discussion establishes that under the law as it existed at the time of Plaintiff's suspension, it was not "clearly established" that a five-day suspension without pay infringes on a protected property interest and thus triggers due process protections.

■■■ As indicated above, for qualified immunity to be surrendered, pre-existing law "must point unmistakably to the unconstitutionality of the defendants' conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Key v. Grayson,* 179 F.3d 996, 999–1000 (6th Cir. 1999). Thus, in this case, to abrogate qualified immunity, pre-existing law "must have dictate[d], that is, truly compel[led] not just suggest[ed]" that the suspension of Plaintiff in this case infringed upon a protected property interest so as to entitle her to the protections of due process. *Id.* Assumptions and theoretical observations do not meet this standard.

Plaintiff having failed to show that the individual Defendants' conduct violated a

clearly established constitutional right of which a reasonable person would have known, the Court finds that Defendants are entitled to the protection of the doctrine of qualified immunity on Plaintiff's Section 1983 due process claim.

■ Even assuming *arguendo* that it was "clearly established" that Plaintiff's five-day suspension infringed a protected property interest so as to trigger due process protection, considering Plaintiff's claim on the merits, the Court finds that Plaintiff was afforded all of the process to which she was entitled.

■ First of all, *Gilbert v. Homar* clearly establishes that a suspended employee is *not* entitled to a hearing prior to suspension. All that is required is that he be advised the reasons for the suspension.

To determine what process is constitutionally due, the Supreme Court has directed lower courts to balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally the Government's interest.

*Gilbert v. Homar*, 520 U.S. at 931–32, 117 S.Ct. at 1812, quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Plaintiff here was not fired as a result of the disciplinary charges lodged against her. The only private interest she can point to as having been affected by the June 1997 disciplinary action was that she was deprived of five days pay. This interest in the uninterrupted receipt of a paycheck was precisely the same interest asserted by the plaintiff in *Gilbert*.[14] In assessing this interest, the Supreme Court stated:

> [W]hile our opinions have recognized the severity of depriving someone of the means of his livelihood, they have also emphasized that in determining what process is due, account must be taken of "the length" and "finality of the deprivation." Unlike the employee in *Loudermill*,[15] who faced termination, respondent faced only a temporary suspension without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health care and life insurance are often not affected at all.

117 S.Ct. at 1813 (citations omitted and footnote added).

In *Gilbert*, the Court found that a hearing 23 days after the plaintiff was suspended was sufficiently prompt. *See also*, *FDIC v. Mallen*, 486 U.S. 230, 243, 108 S.Ct. 1780, 1789, 100 L.Ed.2d 265 (1988) (holding that 90 days before the agency hears and decides the propriety of a suspension does not exceed permissible limits); *Jones v. City of Gary*, 57 F.3d 1435 (7th Cir.1995) (post-suspension hearings held three and six months after suspensions not violative of due process).

Here, Plaintiff was given oral notice before being suspended what she was being charged with. She was suspended pending a full investigation into the matter for only 5 days. She was returned to work immediately, and had a post-suspension hearing 68 days later.

Given that Plaintiff was suspended for only five days, her loss of income was relatively insubstantial. On the other side of the balance, the State has a significant interest in the MDOC assuring that prisoner-patients were being treated properly and humanely.

As to the risk of erroneous deprivation through the procedures used, during Plain-

---

**14.** In *Gilbert* the plaintiff was suspended without pay pending an investigation by his employer into allegations of drug dealing.

**15.** *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)

tiff's suspension, the department conducted a full investigation into the charges lodged against Plaintiff, which directly implicated her treatment of prisoners. Coworkers and prisoners were interviewed—both orally and in writing. Plaintiff herself was given an opportunity to participate in the investigation and respond to questions from the investigators but she refused to do so.

With respect to the delayed post-suspension hearing, as the *Gilbert* Court observed, a delay in conducting a hearing

> actually benefits the employee by allowing state officials to obtain more accurate information about the ... charges. [The employee] has an interest in seeing that a decision ... is not made with excessive haste.

*Gilbert, supra,* 520 U.S. at 935, 117 S.Ct. at 1814.

■ At the post-investigation hearing in this case, Plaintiff was again given another opportunity to respond to the charges and explain her side of the story, and she, in fact, did give her explanations. The totality of the procedures used by Defendants clearly show that the risk of erroneous deprivation was minimal and demonstrate that the *Loudermill* require-

ments of "notice of charges, an explanation of the employer's evidence, and opportunity [for the employee] to present [her] side of the story" were met. *See, Hicks v. City of Watonga,* 942 F.2d 737, 746 (10th Cir. 1991).[16] Therefore, the Court finds no due process violation. Accordingly, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's Section 1983 Due Process Claim.

### 2. *Equal Protection*

■ Plaintiff has also alleged an equal protection claim alleging therein that Defendants Fletcher and DeVoss instituted disciplinary proceedings against her in June 1997 and attempted to transfer her to the second shift in Central Complex in retaliation for her having complained of sexual harassment. [Complaint, ¶¶ 86–89.]

■ However, a pure or generic retaliation claim simply does not implicate the Equal Protection Clause. *See, Ratliff v. DeKalb County,* 62 F.3d 338, 340 (11th Cir.1995) (reversing denial of qualified immunity on equal protection retaliation claim because "[t]he right to be free from retaliation [for making complaints of discrimination] is clearly established as a first amendment right and as a statutory right under Title VII; but no clearly established

**16.** To the extent that Plaintiff here seeks to challenge the post-suspension hearing by arguing that the decision makers were biased against her, Supreme Court precedent establishes that Plaintiff cannot make out a due process violation on these grounds. In *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the school board voted to discharge striking teachers. The teachers alleged that the school board members were biased because they participated in unsuccessful contract negotiations with the teachers and because the board members had manifested some personal animosity toward teachers during the strike. The Supreme Court rejected the teachers' argument of deprivation of due process due to the alleged bias of the board members, explaining:

> Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not ... disqualify a decisionmaker. Nor is a decisionmaker disqualified simply because he has taken a

> position ... on an issue related to the dispute, in the absence of a showing that he is not capable of judging a particular controversy fairly on the basis of its own circumstances....
>
> A showing that the Board was "involved" in events preceding this decision ... is not enough to overcome the presumption of honesty and integrity in [those serving as adjudicators]. Accordingly, we hold that the Due Process Clause of the Fourteenth Amendment did not guarantee respondents that the decision to terminate their employment would be made or reviewed by ... other than [their superiors].

426 U.S. at 496–97, 96 S.Ct. 2308 (citations omitted).

> Participation in events preceding the June 1997 disciplinary action is at best all that Plaintiff here has alleged as the basis for her "bias of the decisionmakers" argument. Clearly, under controlling law, this is insufficient to make out a claim of violation of procedural due process.

right exists under the equal protection clause to be free from retaliation"); *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1296 n. 8 (7th Cir.1996) (Equal Protection Clause "does not establish a general right to be free from retaliation"), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir.1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir.1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Long v. Laramie County Community College Dist.*, 840 F.2d 743, 752 (10th Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988).

Because the great weight of authority demonstrates that no equal protection claim will lie for retaliation, Plaintiff cannot establish that Defendants violated a "clearly established" right. Therefore, by application of the doctrine of qualified immunity, they are immune from liability on Plaintiff's equal protection claim.

▪ Apparently having become aware of the shortcomings of her Complaint upon receipt of Defendants' Motion for Summary Judgment, Plaintiff now states for the first time that what she is really asserting is claim of retaliation for exercising her First Amendment rights of freedom of speech and association. Plaintiff's Complaint, however, is completely void of even any mention of the First Amendment or freedom of speech or association. Furthermore, no such claim was asserted during the discovery phase of this action.

As Judge Posner explained in dismissing the plaintiff's constitutional claims in *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412 (7th Cir.1988),

Yatvin's First Amendment claim is foreclosed ... because [it] not raised below with sufficient particularity ... Yatvin did tell the district court that she was challenging the alleged retaliation on Fourteenth Amendment grounds as well as under Title VII, but she neglected to specify the nature of those grounds. The Fourteenth Amendment is a vast umbrella, and to preserve a claim under it for consideration by an appellate court you must tell the court just what spot of ground beneath the umbrella you're standing on. *A judge might not guess, merely from being told that the Fourteenth Amendment had been violated by retaliation for filing charges of sex discrimination, that the plaintiff was seeking to enforce rights that arise under the First Amendment and have been held applicable to the states by interpretation of the Fourteenth Amendment.* Yatvin did not mention the First Amendment, or freedom of speech or petition, in the district court; it is too late to raise such a claim in this court.

840 F.2d 412, 420–421 (citations omitted.)

▪ The Court agrees with Judge Posner. It is too late for Plaintiff to now raise a claim of violation of First Amendment rights.[17]

---

17. Even if the Court were to consider Plaintiff's First Amendment claim, controlling law would mandate dismissal.

In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court announced a test to determine when the first amendment protects the speech of public employees. It there held "that when a public employee speaks not as a citizen upon matters only of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 103 S.Ct. at 1690. Determining whether speech involves a matter of public or private concern must be based on the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. The fact that an employee alleges discrimination on the part of a public employer is not itself sufficient to transform the dispute into a mat-

*CONCLUSION*

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Complaint be DISMISSED in its entirety, with prejudice.

Let Judgment be entered accordingly.

ter of public concern. *See Rice v. Ohio Dep't of Transp.*, 887 F.2d 716, 721 (6th Cir.1989) ("[T]he First Amendment does not convert every public employee grievance into a matter of public concern...."), *rev'd on other grounds*, 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d 744 (1990). *See also, Altman v. Hurst*, 734 F.2d 1240, 1243–44 (7th Cir.1984), (finding that Plaintiff's actions in instituting a civil rights proceeding and in encouraging a co-worker to appeal his suspension were not matters of public concern so as to bring his claim of retaliation within the protection of the First Amendment), *cert. denied*, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984); *Woodward v. City of Worland*, 977 F.2d 1392, 1403–04 (10th Cir.1992) (speech was personal even though plaintiff complained that other women also had been subjected to sexual harassment by employer), *cert. denied*, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).